# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 05-4363

_____

| | | |
|---|---|---|
| Lee Ambrose, Trustee for the | * | |
| next of kin of Neil Ambrose, and | * | |
| Personal Representative of the | * | |
| Estate of Neil Andrew Ambrose, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Major Darin Young; Mark W. Tisland; | * | |
| and Douglas Weber, | * | |
| | * | |
| Appellants. | * | |

_____

Submitted: June 12, 2006
Filed: January 23, 2007

_____

Before BYE, LAY,[1] and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

Lee Ambrose, personal representative of Neil Ambrose's (Ambrose) estate, filed this action pursuant to 42 U.S.C. § 1983, alleging three South Dakota

_____

[1]The Honorable Donald P. Lay took permanent disability retirement on January 3, 2007. This opinion is being filed by the remaining judges of the panel pursuant to 8th Cir. Rule 47E.

Department of Corrections (DOC) officials (collectively, the officials) violated Ambrose's Eighth Amendment rights by failing to protect Ambrose during a DOC work detail, which resulted in Ambrose's electrocution death caused by a downed power line. The district court denied the officials' motion for summary judgment based on qualified immunity. This interlocutory appeal followed. We affirm in part and reverse in part.

## I.    BACKGROUND

We recite the facts in the light most favorable to Ambrose, the party asserting injury in this action. See Saucier v. Katz, 533 U.S. 194, 201 (2001); Vaughn v. Greene County, Ark., 438 F.3d 845, 849 (8th Cir. 2006). The DOC maintains emergency response teams (ERTs) as part of South Dakota's emergency response program. ERTs are comprised of minimum security inmates from South Dakota's four state penitentiaries. ERTs are dispatched to natural disaster clean-up sites, where they assist in removing downed trees and other debris. Inmates are required to comply with correctional officers' orders and conduct themselves appropriately. In almost all cases, upon the recommendation of the DOC, the governor will reduce the sentence of an inmate who works hard on an ERT. A noncompliant inmate can be written up and punished for violating institutional rules.

At all relevant times, Ambrose was an inmate in the custody of the DOC, Major Darin Young (Major Young) was the DOC's ERT commander, and Douglas Weber (Warden Weber) was the DOC's supervising warden. Ambrose qualified for and participated in the DOC's ERT program. The only training Ambrose received was watching a chainsaw safety training video.

In late July 2002, severe storms damaged property in Sinai, South Dakota. The DOC dispatched several ERTs to Sinai to assist with the storm clean-up. Mark

Tisland (Tisland), a DOC roofing crew supervisor,[2] lived on property in Sinai and volunteered to assist with the ERT clean-up of Sinai.

On the afternoon of July 31, 2002, the DOC sent two ERTs to Tisland's property. Tisland supervised a crew of approximately seven inmates, including Ambrose, and DOC Officer Darin Ewer (Officer Ewer) supervised the second crew. Major Young coordinated and supervised all inmate crews dispatched to the Sinai clean-up.

At approximately 3:45 p.m., Major Young arrived at Tisland's residence to pick up inmates who had appointments in Sioux Falls, South Dakota. At the time, Tisland was standing on the deck of his house and Officer Ewer was taking a water break with the inmates near the northwest side of Tisland's house. As Major Young talked with Tisland on Tisland's deck, a dump truck, with its truck box lifted, drove under a power line. The truck box hooked and dragged the live power line, which eventually snapped free of the truck box, and dangled from the power pole at chest height. The damaged power line ignited a small grass fire. Tisland told his wife to call the power company. Although Tisland reported calling 911, there is no record of the call on the police log.

Officer Ewer and several inmates ran toward the fire. Officer Ewer yelled out, "Stop! Down powerlines [sic]! Watch the powerlines [sic]!" Officer Ewer then reached out to stop one of the inmates from getting any closer. Major Young approached the fire from the other side of the downed power line, and asked, "Do you think we can stomp it out?" Inmates responded affirmatively and moved closer to the fire. Major Young told the inmates to "be careful and just stomp the fire's outer edge."

---

[2]Tisland, previously a roofer, was hired by the DOC to train and supervise inmates for roofing state buildings. In the winter, Tisland would perform indoor maintenance work and supervise inmates performing maintenance duties.

When the fire was extinguished, Major Young told the inmates, "Back off, the fire is out." As the inmates moved away, Ambrose lost his balance and came in contact with the dangling power line. The power line gripped Ambrose, violently shaking his burning body for approximately one to two minutes. Inmates ran to help Ambrose, but Major Young and Officer Ewer ordered them to stay back. The inmates pleaded with Major Young to be allowed to help Ambrose, but Major Young repeatedly told them "no," insisting, "we can not [sic] save him, I can only save you!" One inmate asked for "rubber boots or a rubber pole or something," and Major Young again said, "no," adding, "I didn't want him (Ambrose) hurt and I don't want anymore [sic] hurt." The inmates obeyed Major Young's commands and moved to a safe location. The power line eventually broke, dropping Ambrose's lifeless body to the ground. The inmates again wanted to run up and help, but Major Young repeated his instruction to "stay back because the line [was] unsafe." The fire started up again, but no one attempted to extinguish it.

Tisland called 911, and Major Young called the ERT command center requesting an ambulance and a fire truck. No one approached Ambrose's body until the power company confirmed the electricity had been turned off. Officers from the Department of Criminal Investigations arrived and took statements from the inmates and the DOC staff members.

Ambrose's estate brought this § 1983 action, alleging the officials violated Ambrose's Eighth Amendment rights because (1) Major Young and Tisland failed to protect Ambrose from being electrocuted by a downed power line while on a prison work detail, and (2) Warden Weber made policy decisions that required Ambrose to work under dangerous conditions without providing sufficient training and safety procedures for work crew supervisors. The officials moved for summary judgment based on qualified immunity, which the district court denied. This interlocutory appeal followed.

-4-

## II.    DISCUSSION

### A.    Standard of Review

Generally, a district court's denial of summary judgment is not appealable; however, "'[d]enials of summary judgment based on qualified immunity are immediately appealable to the extent the appeal seeks review of the purely legal determinations made by the district court.'" Vaughn, 438 F.3d at 849 (quoting Wilson v. Lawrence County, Mo., 260 F.3d 946, 951 (8th Cir. 2001)).  We limit our review on an interlocutory appeal to "whether the facts alleged . . . support a claim of violation of clearly established law." Ward v. Moore, 414 F.3d 968, 970 (8th Cir. 2005) (quotation omitted).  We will not assume any facts deemed by the district court to be genuinely disputed. Crow v. Montgomery, 403 F.3d 598, 601 (8th Cir. 2005).

### B.    Eighth Amendment Claim

The Eighth Amendment's prohibition against "cruel and unusual punishment" applies to conditions of confinement, see Rhodes v. Chapman, 452 U.S. 337, 345-47 (1981), and prison work assignments fall under the ambit of conditions of confinement, Choate v. Lockhart, 7 F.3d 1370, 1373 (8th Cir. 1993).  The Eighth Amendment "forbids knowingly compelling an inmate to perform labor that is beyond the inmate's strength, dangerous to his or her life or health, or unduly painful," Sanchez v. Taggart, 144 F.3d 1154, 1156 (8th Cir. 1998), and requires supervisors to supervise and train subordinates to prevent the deprivation of a constitutional right, see Tlamka v. Serrell, 244 F.3d 628, 635 (8th Cir. 2001).

To prevail on his Eighth Amendment claim, Ambrose "must prove both an objective element, which asks whether the [risk of harm] was sufficiently serious, and a subjective element, which asks whether the defendant officials acted with a sufficiently culpable state of mind." Choate, 7 F.3d at 1373.

### 1.     Proper Liability Standard

The Supreme Court and our circuit previously have held the state of mind giving rise to liability in a condition of confinement case is deliberate indifference. Wilson v. Seiter, 501 U.S. 294, 303 (1991); see Choate, 7 F.3d at 1373-74. The officials argue the deliberate indifference standard is inappropriate in this case, and urge the court to apply the higher liability "intent to harm" standard set forth in Whitley v. Albers, 475 U.S. 312, 320-21 (1986), or the "shocks the conscience" standard set forth in County of Sacramento v. Lewis, 523 U.S. 833, 853-54 (1998).

In Whitley, the Supreme Court held the deliberate indifference standard did not apply to an Eighth Amendment claim brought by a prisoner shot in the leg during a prison riot. Whitley, 475 U.S. at 316, 319-20. The Court reasoned, "a deliberate indifference standard does not adequately capture the importance of such competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." Id. at 320. Instead, in such circumstances, the officials' culpability is measured by "'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'" Id. at 320-21 (quotation omitted).

In Lewis, the parents of a motorcycle passenger killed during a high-speed automobile chase brought a substantive due process claim against the officials involved in the pursuit. Lewis, 523 U.S. at 837. Drawing a comparison to Whitley, the Supreme Court concluded,

> when unforeseen circumstances demand an officer's instant judgment, even precipitate recklessness fails to inch close enough to harmful purpose to spark the shock that implicates the large concerns of the governors and the governed. . . . Just as a purpose to cause harm is

-6-

needed for Eighth Amendment liability in a riot case, so it ought to be needed for due process liability in a pursuit case.

Id. at 853-54 (citation and internal quotation omitted); see also Neal v. St. Louis County Bd. of Police Comm'rs, 217 F.3d 955, 958 (8th Cir. 2000) (holding, "in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation, [an official]'s action will shock the conscience only if the [official] intended to cause harm," whereas, when an official "is afforded a reasonable opportunity to deliberate . . . the chosen action will be deemed 'conscience shocking' if the action was taken with 'deliberate indifference'").

Arguably, the "shocks the conscience" standard applied to the substantive due process claim in Lewis does not apply in the Eighth Amendment context, see Whitley, 475 U.S. at 327, nonetheless, both Lewis and Whitley are distinguishable from the present case. It is undisputed the small grass fire did not put any person or property in imminent danger. Major Young noted in his incident report that when the fire erupted, he (1) "yelled out to the inmates to hold up"; (2) "asked where the power line was"; (3) "observed the power line"; (4) "kept telling everyone to wait and be safe"; and (5) "when the fire was at the edge of their feet, [Major Young] told them to be careful and just stomp the fire's outer edge." During his deposition, in describing how he approached and evaluated the fire, Major Young stated, "I'm assessing. I'm looking. I'm listening, trying to figure out what's going on here. How safe is the situation." Contrary to the officials' assertions, these facts indicate although the events happened quickly, Major Young did in fact deliberate, albeit briefly, and consider the circumstances before telling the inmates to stomp out the fire. Based on the record before us, we conclude Major Young was not confronted with exigent circumstances or competing obligations when he told the inmates to stomp out the fire.

We previously held the deliberate indifference standard applies to claims against prison officials responding to prisoners' serious and urgent medical needs. See Plemmons v. Roberts, 439 F.3d 818, 823 (8th Cir. 2006) (citing Tlamka, 244 F.3d at 633). Similarly, officials not confronted with competing obligations or exigent circumstances, who are responsible for inmate safety during work assignments, also should be held to the deliberate indifference standard. We conclude the deliberate indifference standard is the appropriate liability standard in the present case.

### 2. Deliberate Indifference Standard

What constitutes deliberate indifference has not been specifically defined. However, the Supreme Court has said, while "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer v. Brennan, 511 U.S. 825, 835 (1994) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)). Under the deliberate indifference standard, a prisoner

> need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. . . . Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

Id. at 842.

In the prison work assignment context, prison officials are deliberately indifferent when they knowingly compel "an inmate to perform labor that is beyond

the inmate's strength, dangerous to his or her life or health, or unduly painful." Sanchez, 144 F.3d at 1156.

### C. Qualified Immunity Analysis

The officials next argue they are entitled to qualified immunity even under the deliberate indifference standard. "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Reasonover v. St. Louis County, Mo., 447 F.3d 569, 580 (8th Cir. 2006). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Davis v. Hall, 375 F.3d 703, 712 (8th Cir. 2004) (quotation omitted). Qualified immunity will be defeated "if an official '*knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or* if he took the action *with the malicious intention* to cause a deprivation of constitutional rights or other injury.'" Harlow, 457 U.S. at 815 (quoting Wood v. Strickland, 420 U.S. 308, 322 (1975)). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal quotations omitted).

We analyze the officials' qualified immunity claims in two steps. Saucier, 533 U.S. at 201. First, viewing the facts in the light most favorable to Ambrose, we ask whether the official's conduct violated a constitutional right. See id. If the answer is no, "there is no necessity for further inquiries concerning qualified immunity." Id.[3]

---

[3]Under step one of the Saucier analysis, if the court finds no constitutional violation occurred, the analysis ends and the issue of qualified immunity is not addressed. Saucier, 533 U.S. at 201. This is not to say, however, the defendant

On the other hand, if the answer is yes, we must determine "whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." Vaughn, 438 F.3d at 850 (citing Saucier, 533 U.S. at 201-02).

With regard to the first inquiry, to establish a violation of an Eighth Amendment right, Ambrose must prove both an objective component, that is, whether being told to work near a downed power line posed a substantial risk of serious harm, and a subjective component, that is, whether the officials knew of but disregarded, or were deliberately indifferent to, Ambrose's safety. See Crow, 403 F.3d at 602.

The objective component of the analysis is met in this case. The officials do not dispute working near a downed power line creates a substantial risk of serious harm. Thus, in this case, the question of an Eighth Amendment violation turns on whether the officials had the requisite knowledge of a substantial risk to Ambrose's life or health, and disregarded the risk. Farmer, 511 U.S. at 842.

---

official is entitled to qualified immunity. Rather, if no constitutional violation occurred, plaintiff's claim fails as a matter of law because plaintiff did not prove an essential element of the § 1983 claim. See Brosseau v. Haugen, 543 U.S. 194, 201 (2004) (Breyer, J., concurring) (distinguishing Saucier's step one as the "constitutional question," and step two as the "qualified immunity question"). See generally Wright v. Philadelphia, 409 F.3d 595, 604-05 (3d Cir. 2005) (Smith, J., concurring). This distinction does not interfere with appellate jurisdiction; see Wright, 409 F.3d at 606-07 (Smith, J., concurring) (opining an interlocutory appeal brought because of the denial of qualified immunity is within the scope of appellate review even if the appellate court ultimately determines the § 1983 claim fails as a matter of law because no constitutional violation occurred, rather than on the basis the officials are entitled to qualified immunity).

### 1.    Major Young

Major Young was in charge of all inmate crews involved in the Sinai clean-up. As previously discussed, Major Young knew the dangling, live power line created a substantial risk of harm.  Despite this known risk, Major Young told the inmates to stomp out a non-threatening fire within arms reach of an obviously unstable and live power line.  Inmates interviewed by investigators immediately after the accident recounted Major Young's instruction to stomp out the fire and indicated inmates followed the instruction.[4]  During his deposition, Major Young testified, "I don't know why I didn't say stop," and initially suggested the inmates may not have obeyed him if he had told them to stop.  Major Young also testified he expected inmates to obey his directions, and that the inmates did obey his instructions to "back off" once the fire was out and to stay back and leave the area after Ambrose came in contact with the live power line.  Major Young then said he believed the inmates probably would have obeyed an order to stop and stay away from the power line. Viewing this evidence in the light most favorable to Ambrose, we conclude Major Young's instruction to stomp out a fire burning near a dangling, live power line constituted deliberate indifference to a known and substantial risk.

Because we answer the first prong of the qualified immunity analysis in the affirmative, we turn to the second prong and ask whether the law was clearly established at the time of Ambrose's death, such that a reasonable officer would

---

[4]Inmate Pat Freidel told the interviewer the inmates "made Major Young aware of the fire as well as the down [sic] wire."  Thereafter, "Major Young asked them if they could put the fire out," and then gave them "the go-ahead [sic] to put out the fire."  Inmate Shiloh Baysinger said, when the inmates "heard Major Young ask if they could get the fire put out before it spreads," "they all took notice and approached the fire/down [sic] wire."  Inmates Andrew Perez, Travis Schultz, Russel Schleppenbach, Justin Lipinski, and Orville Walking Eagle Jr. similarly recounted Major Young giving this instruction.

understand his conduct violated the law in the circumstances he confronted. See Vaughn, 438 F.3d at 850. It is well-established in this circuit that "knowingly compelling an inmate to perform labor that is . . . dangerous to his or her life or health" is a violation of the Eighth Amendment. Sanchez, 144 F.3d at 1156; see Buckner v. Hollins, 983 F.2d 119, 123 (8th Cir. 1993) ("The Eighth Amendment right of an inmate to be free from cruel and unusual punishment is well established, as are . . . a prison official's Section 1983 liability for failure to protect a prisoner from foreseeable attack or otherwise to guarantee his or her safety."). Viewing the facts in the light most favorable to Ambrose, we therefore conclude Major Young's conduct was not "objectively legally reasonable," see Sanchez, 144 F.3d at 1157 (quotation omitted), and the district court properly denied Major Young qualified immunity.

### 2. Tisland

Tisland was the DOC roofing supervisor who volunteered to help supervise the Sinai clean-up. When the truck snagged the power line and the fire erupted, Tisland was standing on the deck of his house. Tisland told his wife to call the power company. Although Tisland states he placed a 911 call at this point, there is no record of the call. Major Young's report states Tisland started making calls to get some help with the fire as Major Young ran "to get ahead of the inmates." Although it is disputed whether Tisland placed the first 911 call, it is undisputed Tisland was not near the fire or Ambrose at the time of the accident, did not give any commands regarding the fire, and was not in an immediate position to give any commands.

In denying Tisland qualified immunity, the district court reasoned Tisland (1) knew the power line was live and dangerous, (2) gave conflicting statements regarding his 911 calls, (3) did not tell his crew to stop or to stay away from the power line, and (4) would go no closer than within ten feet of the downed power line. At most, these facts tend to show Tisland acted unreasonably in failing to take certain

measures, which is not enough to support liability under the Eighth Amendment. Newman v. Holmes, 122 F.3d 650, 653 (8th Cir. 1997) (concluding "the duty to act reasonably is a negligence standard, and Farmer stands for the broad proposition that deliberate indifference includes something more than negligence but less than actual intent to harm" (citing Farmer, 511 U.S. at 835)).

First, everyone knew the power line was live and dangerous. Second, the 911 call, or the failure to call 911, did not contribute in any way to Ambrose's death. Third, the record does not indicate Tisland participated in any instructions to his crew. Officer Ewer and Major Young ordered the inmates to stop and stay away from the power line, making any further direction for Tisland redundant and unnecessary. Fourth, we see no culpable relevance to whether Tisland would not approach within ten feet of the downed power line. Any constitutional deliberate indifference arose when the inmates were directed by Major Young to extinguish the fire near the downed power line. Thus, taking the facts in the light most favorable to Ambrose, we conclude Tisland did not commit any act or omission with the requisite culpability to give rise to an Eighth Amendment violation.

### 3.    Warden Weber

We also disagree with the district court's conclusion Warden Weber violated Ambrose's Eighth Amendment right by failing to train Major Young and Tisland properly. Warden Weber "may not be held liable under § 1983 for the constitutional violations of a subordinate on a respondeat superior theory." Tlamka, 244 F.3d at 635. Warden Weber may be liable for failure to train if (1) the DOC's training practices regarding disaster relief were inadequate; (2) Warden Weber's "failure to train reflects a deliberate and conscious choice" by the DOC; and (3) an alleged deficiency in the DOC's training procedures actually caused Ambrose's death. Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (quoting City of Canton v.

Harris, 489 U.S. 378, 389 (1989)).  For liability to attach, Ambrose must show "'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [Warden Weber] can reasonably be said to have been deliberately indifferent to the need.'"  Id. (quoting City of Canton, 489 U.S. at 390).

The district court found Warden Weber's lack of training amounted to deliberate indifference because Warden Weber (1) knew storm clean-up crews previously had encountered downed power lines; (2) admitted ERT leaders had no specific protocol to protect prisoners from the danger of downed power lines; (3) expected Major Young to keep inmates away from downed power lines; (4) assumed the inmates received safety briefings, but never heard Major Young instruct inmates about the specific dangers of power lines; and (5) knew of no ERT inmate that had ever suffered a serious injury or fatality, but knew of previous minor injuries such as heat exhaustion, dehydration, cuts, and insect bites.

Nothing in this record suggests a training inadequacy so obvious it would put Warden Weber on notice a constitutional violation was likely to result.  Previous accidents involved only minor injuries.  Warden Weber testified that before ERTs are deployed to disaster sites, he expected staff members and inmates received a safety briefing where the inmates are told "specifically what to watch out for, whether there [were] hazardous materials in any of the buildings, [and] downed power lines."  Warden Weber anticipated the briefing would include the reminder "to stay away from power lines because they're potentially fatal," adding "that's kind of what we're taught from elementary school on.  You know, I think that's fairly common knowledge."  Warden Weber further testified inmate training included safety programs for chain saw operators, buffer operators, hazardous material handlers, janitors, tuckpointers, and dog handlers.  When asked if it was "the policy of the DOC

-14-

to have inmates go within an arm's length of a power line that could be live at a deployment scene," Warden Weber declared, "It's certainly not a policy of the DOC. I think that's a judgment call of the on-scene commander, the person who was actually there directing."

Nor is there any evidence Major Young would have acted differently had he received more training. It is undisputed Major Young knew downed power lines were dangerous and should be avoided. At his deposition, Major Young testified that before the Sinai clean-up, he worked an ERT clean-up detail in Spencer, South Dakota, where he encountered downed power lines. Major Young said he walked amid the downed lines, but qualified, "Would I have behaved the way I did, by just walking through, if I did not know [the lines were dead]? No, certainly not." When asked why, Major Young answered, "Fear of–of electricity." In regard to the Sinai clean-up, when asked why, knowing the power line was live, he told the inmates to stomp out the fire rather than telling them to stay back, Major Young responded, "I don't know why I didn't say stop." It is apparent Major Young's instruction to the inmates to stomp out a fire within arms reach of a live power line was not because of inadequate training.

When an emergency arises, the individual's chosen action will reflect a combination of the individual's training and common sense. Major Young's own training, experience, and common sense informed him of the obvious danger of a downed live power line and also the obvious need to avoid straying too close to the power line. It is irrefutable Major Young's decision was not made because of inadequate training. It is unreasonable to expect training to anticipate and incorporate every possible specific dangerous scenario. Finally, no evidence or reasonable inference from the evidence supports Ambrose's allegation that a deficiency in the DOC's training procedures actually caused Ambrose's death. Based on the foregoing,

we conclude Warden Weber did not fail to train Major Young and Tisland properly, and any alleged failure to train did not contribute to the cause of Ambrose's death. Therefore, Warden Weber did not violate Ambrose's constitutional rights.

## III.    CONCLUSION

For the reasons stated, we affirm the district court's denial of qualified immunity as to Major Young, but reverse the district court's judgment as to Tisland and Warden Weber, because the § 1983 claims against them fail.

_____