# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3802

_____

| | | |
|---|---|---|
| Margaret Hayek, as trustee for the next of kin of William Charles Hayek, deceased, | * * * * | |
| Appellant, | * * | |
| v. | * * | Appeal from the United States District Court for the |
| City of St. Paul; Matthew Toronto; Jay Thompson; Peter Crum; John Linssen, | * * * * | District of Minnesota. |
| Appellees. | * | |

_____

Submitted: April 3, 2007
Filed: June 29, 2007

_____

Before BYE, BRIGHT, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge

Margaret Hayek (Hayek), the mother of and trustee for William Charles Hayek (William), filed an action alleging a claim under 42 U.S.C. § 1983 and also alleging state law claims based on negligence and battery against the City of St. Paul (City) and the St. Paul police officers (officers) involved in the shooting death of William, as well as a claim against the City for a violation of the Minnesota Constitution, art. I, §§ 7 & 8. Claiming qualified and official immunity, and failure to state a claim, the

City and the officers filed a motion for summary judgment. The district court,[1] finding no federal or state constitutional violation and finding the officers' conduct was not willful or malicious, granted the City's and officers' motion for summary judgment. We affirm.

## I.     BACKGROUND

Hayek lived with her son, William, in an apartment in St. Paul, Minnesota. William graduated from high school in June 2002. William was 19 years old and was approximately six-feet seven-inches tall and weighed about 300 pounds. William owned a replica Samurai sword made of very heavy metal with a blade approximately three-and-one-half feet in length.

During the summer of 2002, William applied for, but did not get, a job as an airport security guard. William became depressed as a result of his failure to obtain employment and to get a driver's license. Hayek noticed a change in William's temperament and moods.

Hayek spent most of September 2, 2002, at the Minnesota State Fair. Before Hayek left her apartment that day, William told her he did not feel well, thought he had the West Nile virus, and did not want to die. Although concerned, Hayek did not think she needed to seek help for William at that time. Thus, Hayek left her apartment and went to the fair.

Upon returning to her apartment at approximately 10:00 p.m., Hayek found William sitting in a chair holding a Bible in one hand with his Samurai sword beside him. Hayek noticed a box on the floor containing toys and video games, and when she attempted to pick up the box, William told Hayek, "Don't touch them." William

---

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

-2-

said, "Go to your sister's," but Hayek responded she would not go to her sister's home. William then got up, locked the apartment door, and sat down again. Hayek noticed William staring at the television, but the television picture was all snow. At that point, Hayek asked William, "What's going on?" William replied, "You don't know what's going on. You'll find out." William then told Hayek, "I love you Mom, but you have the devil in you." William's behavior frightened Hayek, and she went into her bedroom.

Once in her room, Hayek called First Call for Help and then Crisis Intervention to report her son's behavior, and was advised to call the police. Hayek also received a telephone call from her friend who had spoken with William earlier that day. Hayek's friend informed her William believed "the police were out to get him, the police tapped his phone," and "the police thought he was a bad guy." At her friend's request, Hayek immediately called Patricia Motter (Motter), Hayek's sister, a counselor for mentally disabled persons. Motter attempted to talk to William on the telephone, but William refused and disconnected the call. Hayek then called her cousin, Budde Lee (Budd). Budd advised Hayek he had spent the day with William, and William was "going in and out of reality."

Meanwhile, Motter called 911 because she was concerned about Hayek. The 911 operator dispatched St. Paul police officers to Hayek's residence. The 911 operator also called Hayek. Hayek told the operator William claimed Hayek had the devil inside her and William had to get it out. The 911 operator told Hayek to get out of the house or go to a different room. After talking to the 911 operator, Hayek grabbed the keys to the apartment, told William she had to get something out of her truck, and went outside, where she met St. Paul Police Department Officers Neil Nelson (Officer Nelson) and Matthew Toronto (Officer Toronto). Hayek advised the officers she thought William was having a nervous breakdown, he was not on any medications or drugs, and she did not want William hurt. Hayek gave the officers the keys to her apartment.

-3-

Officers Toronto and Nelson entered the apartment and found William sitting in a chair holding his Samurai sword in his lap. Officer Nelson asked William to put down his sword. William replied he could not because he was doing his job. William told the officers his mom was the devil, she had been mean to him lately, and that "it was his job to get the devil out of his mom." William also stated the cops had been after him. The officers told William they "were there to help him" and "were his friends," and again asked William to put down his sword. Officer Nelson asked William what he was watching on televison. William replied he was not watching televison, he was just reading the Bible. Again, the officers asked William to put down his sword. William refused and told the officers, "You're the devil. My mom's the devil. Budd's the devil. He is trying to poison me." When Officer Toronto asked William how Budd was trying to poison William, William threw a bottle of pills to the floor. By this time, other St. Paul police officers had arrived on the scene, including Officers Peter Crum (Officer Crum), John Linssen (Officer Linssen), and Jay Thompson (Officer Thompson) and his canine partner, Harley.

Officer Toronto continued to try to convince William to put down his sword. Eventually, William shrugged his shoulders, said "okay," laid down his sword, and voluntarily walked out of the apartment into the hallway. Officer Toronto told William everything would be okay and they were going to get William some help. Officer Toronto directed William to turn around and put his hands on his head. Officer Toronto placed a handcuff on William's right hand. However, when Officer Toronto tried to handcuff William's left hand, William resisted, pushed the officer, pulled away, and ran toward the apartment. Officer Toronto attempted to stop William; Officer Thompson then yelled "Canine stop!" and released Harley. The police canine chased William into the apartment and bit his leg. Officer Thompson also followed William inside the apartment to stop William from acquiring the Samurai sword and hurting himself or anyone else.

-4-

Inside the apartment, Officer Thompson attempted to stop William from grabbing his sword. William, however, managed to grab his sword and started to swing the sword first at Harley and then at Officer Thompson. William slashed Officer Thompson's arm. Officer Thompson recalled Harley, then yelled for help and began to retreat by crawling away on his hands and knees. Believing William was going to kill Officer Thompson, Officers Crum and Linssen fired their weapons and shot William. However, the officers' shots did not stop William from attacking Officer Thompson. After being shot, William responded "ow," but continued to stab Officer Thompson. In an attempt to escape, Officer Thompson continued to crawl on his hands and knees, but William followed him and stabbed Officer Thompson in his right arm. The sword went through Officer Thompson's arm into his chest, breaking a rib and puncturing Officer Thompson's right lung. Officer Thompson continued to crawl, but William pursued and stabbed Officer Thompson through his right leg. At that time, Officer Nelson fired his shotgun at William, killing William. Officer Thompson survived the incident. Officer Thompson was hospitalized for two-and-one-half weeks, and returned to work two-and-one-half months later.

Hayek filed a lawsuit alleging claims under 42 U.S.C. § 1983 and state law claims based on negligence and battery and on the Minnesota Constitution, art. I, §§ 7 & 8. The City and the officers filed a motion for summary judgment, claiming qualified immunity and no federal constitutional violation on the § 1983 claim, and official immunity and no state constitutional violation on the state law claims. The district court granted the City's and the officers' motion. This appeal followed.

## II.  DISCUSSION

Hayek contends federal and state constitutional violations occurred, and the City and officers are not entitled to either qualified or official immunity; thus, the district court erred in granting summary judgment. We review de novo a grant of summary judgment. Pope v. ESA Servs., Inc., 406 F.3d 1001, 1006 (8th Cir. 2005). Summary judgment is proper if, after viewing the evidence and drawing all reasonable

inferences in the light most favorable to the nonmovant, no genuine issues of material fact exist and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Pope, 406 F.3d at 1006.

### A. Section 1983 Claim

Section 1983 provides a cause of action against government officials who deprive persons of "rights, privileges, or immunities secured by the Constitution." 42 U.S.C. § 1983. However, government officials are entitled to a dismissal "if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Sanders v. City of Minneapolis, Minn., 474 F.3d 523, 526 (8th Cir. 2007) (quotation omitted). "In addressing an officer's claimed entitlement to qualified immunity, the court must first determine whether the allegations amount to a constitutional violation, and then, whether that right was clearly established." Id. (citing Saucier v. Katz, 533 U.S. 194, 201 (2001)). "Qualified immunity is not just a defense to liability, it constitutes immunity from suit." Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005). If the allegations and undisputed facts do not amount to a constitutional violation, there is no necessity for further inquiries concerning qualified immunity. Ambrose v. Young, 474 F.3d 1070, 1077 n.3 (8th Cir. 2007) (standard of review explained).

Because Hayek's case presents an issue of whether the officers used excessive force, we must analyze the case under the Fourth Amendment's objective reasonableness standard. See Craighead v. Lee, 399 F.3d 954, 961 (8th Cir.) (internal quotation marks and citations omitted), cert. denied, 126 S. Ct. 472 (2005). "'[T]he question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Id. (quoting Graham v. Connor, 490 U.S. 386, 388 (1980)). "Apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Id. "Hence, '[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.'" Id. (quoting

<u>Tennessee v. Garner</u>, 471 U.S. 1, 11 (1985)). However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 197-98 (2004) (quoting <u>Garner</u>, 471 U.S. at 11).

Here, the facts viewed in the light most favorable to Hayek, show the officers' use of deadly force was urgent and necessary to protect an officer under attack and was not constitutionally unreasonable. William posed a significant risk of death or serious physical injury to the officers. William stabbed Officer Thompson more than once with the Samurai sword, inflicting serious injuries. The officers' response was a reasonable defensive action and did not violate William's Fourth Amendment right to be free from unreasonable seizures.

Hayek argues deadly force was not reasonable because the officers' actions escalated the situation. Specifically, Hayek asserts the officers provoked William's paranoia by (1) attempting to handcuff him; (2) releasing Harley, the canine partner; and (3) reentering the apartment after William fled inside. These arguments lack merit. The officers reasonably feared William would use the sword to hurt himself or others. The officers could not leave the scene and abandon Hayek with William. The facts show a 911 call was placed because William, while holding a three-and-a-half foot long Samurai sword, told Hayek she had the devil inside her. Hayek confirmed this statement and was afraid William would try to get the devil out of her with the sword. The officers had probable cause to believe William posed a threat of serious physical harm to himself, Hayek, and others. The officers did not escalate the situation; rather, they merely reacted to William's threatening and violent behavior, resulting in the officers' use of deadly force to save Officer Thompson from William's violent attack.

Here, the undisputed facts show William had repeatedly stabbed Officer Thompson with a Samurai sword, as the officer crawled on his hands and knees

-7-

attempting to escape. The officers used deadly force after William stabbed Officer Thompson, but this first use of deadly force was ineffective in stopping or controlling Williams, who continued to pursue Officer Thompson with the Samurai sword. The officers used deadly force again, resulting in William's death. The officers' decision to use deadly force to protect a fellow officer under attack was reasonable and justified.

Hayek claims William's mental disability (which is not documented in the record) should have precluded the use of deadly force. Even if William were mentally ill, and the officers knew it, William's mental state does not change the fact he posed a deadly threat to the officers. See Sanders, 474 F.3d at 527. ("Knowledge of a person's disability simply cannot foreclose officers from protecting themselves, the disabled person, and the general public when faced with threatening conduct by the disabled individual." (citing Bates ex rel. Johns v. Chesterfield County, Va., 216 F.3d 367, 372 (4th Cir. 2000))). See also Hassan v. City of Minneapolis, __ F.3d __, __ (No. 06-3504), 2007 WL 1556727 (8th Cir. May 31, 2007).

The officers had every reason to believe William would have killed Officer Thompson or any of them; thus, it was reasonable for the officers to use deadly force, and no federal constitutional violation occurred. "Without a constitutional violation by the individual officers, there can be no § 1983 or Monell[2] . . . municipal liability." Sanders, 474 F.3d at 527. (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam)); see Ambrose, 474 F.3d at 1077 n.3. The district court properly granted summary judgment in favor of the City and the officers with respect to Hayek's § 1983 claim.

---

[2]Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).

### B. State Law Claims

#### 1. Official Immunity

"The official immunity doctrine provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Elwood v. County of Rice, 423 N.W.2d 671, 677 (Minn. 1988) (internal quotation marks omitted). Under Minnesota law, the decision to use deadly force is a discretionary decision entitling a police officer to official immunity absent a willful or malicious wrong. Maras v. City of Brainerd, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993). "In determining whether an official has committed a malicious wrong, we consider whether the official has intentionally committed an act that he or she had reason to believe is prohibited." State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 571-72 (Minn. 1994). This "contemplates less of a subjective inquiry into malice, which was traditionally favored at common law, and more of an objective inquiry into the legal reasonableness of an official's actions." Id. at 571. Official immunity also protects government entities from vicarious liability for actions that are entitled to immunity. Wiederholt v. City of Minneapolis, 581 N.W.2d 312, 316 (Minn. 1998). See also Hassan, 2007 WL 1556727 at *4.

Because the officers' use of deadly force was reasonable, a reasonable fact-finder could not conclude the officers' conduct was willful or malicious. Here, the officers had every reason to believe they were in grave danger, and that using deadly force against William to protect Officer Thompson and themselves was reasonable. No facts, or reasonable inferences, in the record show the officers' conduct was willful or malicious. Thus, under Minnesota law, the officers are entitled to official immunity as to all state law claims based on negligence and battery. Id. at *5.

Hayek argues William's mental state prevents officers from claiming official immunity. However, as explained above, even if William were mentally ill, William's mental state does not change the fact he posed a deadly threat to the officers. Cf. Sanders, 474 F.3d at 527 (holding the city of Minneapolis and its officers did not

violate the Fourth Amendment and were entitled to summary judgment when the officers used deadly force against a mentally ill person who posed a deadly threat). Here, the officers used deadly force after William attacked Officer Thompson with a Samurai sword, stabbing Officer Thompson in the arm and leg, piercing his chest.

Hayek also contends the officers are not entitled to official immunity because they failed to follow their ministerial duties under the police department's Policy on Emotionally Disturbed Persons (policy). See Mumm v. Mornson, 708 N.W.2d 475, 493 (Minn. 2006) (holding that the officers were not entitled to official immunity because they failed to comply with ministerial policy). This policy states, among other things, officers should restrain emotionally disturbed persons, reduce fear in the disturbed person by trying to establish a friendly relationship, and prevent injuries to the officers, the disturbed person, and any bystanders. Assuming the officers knew or reasonably suspected William was mentally ill, the record clearly shows the officers adequately complied with this policy.[3] The officers attempted to establish a friendly relationship with William, to restrain William, and to protect William, themselves, and Hayek by ordering and pleading with William to put down his sword. The officers used deadly force after William stabbed Officer Thompson and continued to pursue the officer. After William stabbed Officer Thompson, the officers' conduct, under such exigent circumstances, was manifestly discretionary. See Bailey v. City of St. Paul, 678 N.W.2d 697, 701 (Minn. Ct. App. 2004) ("Public officials responding to emergencies often face circumstances that, by their nature, require the exercise of discretion."). Thus, the officers here are entitled to official immunity. Because the officers' discretionary actions are entitled to official immunity, the City has no vicarious liability. See Wiederholt, 581 N.W.2d at 316; Dokman v. County of Hennepin, 637 N.W.2d 286, 297 (Minn. Ct. App. 2001) ("Vicarious official immunity protects a governmental entity from liability based on the acts of an employee who is entitled to official immunity."). Summary judgment was properly granted.

---

[3]Because we conclude the officers complied with the policy, we do not reach the issue of whether the policy at issue here is, as Hayek argues, ministerial in nature.

### 2.  State Constitution Claim

Hayek also claims the officers violated William's rights under the Minnesota Constitution.  Citing sections 7 and 8 of art. I (Bill of Rights) of the Minnesota Constitution,[4] Hayek contends she is entitled to compensation for William's death under a theory of denial of life without due process and inverse condemnation. However, as the district court noted, Hayek provides no authority to support this claim.  We know of no such Minnesota authority, and conclude Hayek's contention has no merit under the facts of this case.  Thus, the district court properly dismissed this state constitutional claim.

## III.  CONCLUSION

We affirm the well reasoned opinion and the judgment of the district court.

_____

---

[4]In relevant part, section 7 states, "No person shall be held to answer for a criminal offense without due process of law, and no person shall . . . be deprived of life, liberty or property without due process of law."  Minn. Const. art. I, § 7.  Section 8 provides, "Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character."  Minn. Const. art. I, § 8.