David MARAS, as Trustee for the Heirs of Barry Glen Peterson, Respondent,

v.

CITY OF BRAINERD, et al., Appellants,

County of Crow Wing, Richard Wetherell, d/b/a Iron Rail Saloon, and Daniel Kuhn, d/b/a Dutch Room Bar, Respondents.

Nos. C8–92–1676, C1–92–1700.

Court of Appeals of Minnesota.

June 22, 1993.

Review Denied Aug. 16, 1993.

Thomas Lyons and Mary Ivory, St. Paul, William O'Hara, Jr., Brainerd, for respondent David Maras, as Trustee for the Heirs of Barry Glen Peterson.

Pierre Regnier, Leonard Schweich, Jardine, Logan & O'Brien, St. Paul, for appellants City of Brainerd, et al.

John Iverson, Minneapolis, for respondent County of Crow Wing.

John Sens, Minneapolis, for respondent Richard Wetherell, d/b/a Iron Rail Saloon.

Michael Milligan, St. Cloud, for respondent Daniel Kuhn, d/b/a Dutch Room Bar.

Considered and decided by AMUNDSON, P.J., and CRIPPEN and DAVIES, JJ.

## OPINION

AMUNDSON, Presiding Judge.

This appeal is from the district court's denial of appellants' motion for summary judgment. Appellants sought summary judgment on the grounds that the decedent's trustee failed to plead a proper 42 U.S.C. § 1983 claim and that they were entitled to qualified, official and discretionary immunity. We affirm in part, reverse in part and remand.

## FACTS

On July 13, 1991, Brainerd police officer Thomas Pfingsten shot and killed Barry Peterson (Peterson).

Peterson and his wife Natalie (Mrs. Peterson) spent the evening of July 12, 1991 at two Brainerd bars. They left one of the bars at closing time. When Peterson discovered that garbage was strewn all over their car, he got into an argument with people near the car.

Officer Raymond McCollum of the Brainerd Police Department arrived at the scene. He stated that Peterson was "yelling, swearing, staggering down the sidewalk." Mrs. Peterson said she asked McCollum to take her husband to detox, but McCollum denies this. Mrs. Peterson indicated that when she asked McCollum to take her husband to detox, "[h]e just said he didn't have enough people, that he didn't feel like he was doing anything wrong. There wasn't enough people to take him there." McCollum told her to put her husband in the car and take him home.

The Petersons returned to their home in rural Brainerd. After they got home, Mrs. Peterson believed her husband was going to try to drive back into town. She hid one set of car keys from him in an attempt to prevent him from leaving the house. Peterson, however, "grabbed a handful" of knives from a kitchen drawer, took a cooler full of beer, left the house and got into a car.

After Peterson left the house, Mrs. Peterson called 911. She told the police dispatcher:

I need some help with my husband. Come and get him. He's gone nuts on us * * * He's getting ready to get in my car and drive away, and he's drunker than you know what, and he says [he is] going to try and do something to somebody * * *. He's got about eight knives on him, sharp ones.

The Crow Wing County dispatcher radioed police in the area that an intoxicated individual had armed himself with eight knives and was attempting to leave the residence with the knives to "go somewhere to do something to somebody." Pfingsten heard the call and was the first officer to arrive at the scene. He parked on the street so that he would be able to approach unnoticed. Leaving his police-issued baton in the car, he got out of his car, walked to the end of the driveway and looked up the driveway toward the garage. He saw a blue vehicle with the motor running.

Pfingsten saw the car back up and hit something—he didn't know if it was the tree limb which extended over the driveway—but it stopped the car's rearward motion. He radioed "He's trying to drive out of here." Pfingsten "made the judgment" that the person in the car was probably "the suspect, from information given over the radio."

Pfingsten saw a woman (later identified as Mrs. Peterson) asking Peterson to get out of the car. She told him to "put down the knife, or something to that effect." She seemed "very angry with [his] behavior" and "was very insistent that he get out."

Officer Raymond McCollum, who arrived at the scene later, stated that Mrs. Peterson did not indicate that she was in fear for her life or that she had "any fear whatsoever" concerning Peterson. McCollum also stated that Mrs. Peterson did not appear to be in danger when she was near him.

Mrs. Peterson turned to look to her right and saw Pfingsten running up the driveway with his gun ready. Pfingsten denies this, saying he did not draw his gun until Peterson got out of the car. It is also disputed whether Pfingsten immediately pointed his gun at Peterson.

Peterson got out of the car. He was holding a knife in one hand and a beer can in the other. Witnesses dispute the position of the knife. Appellants say that Peterson moved his arm so that the knife was between his waist and his chest. McCollum testified that the knife was at Peterson's hip or below at all times. Kevin Baker, a witness present in the Petersons' driveway before the police arrived, testified that Peterson was staggering and repeatedly fell against the car. Mrs. Peterson testified that Peterson could barely stand and that also indicated that he repeatedly fell against the side of the car.[1] Pfingsten shouted 3–5 times at Peterson to drop the knife. According to Mrs. Peterson and Baker, Peterson responded "Let's party." Pfingsten indicated that Peterson asked him what he was "going to do about it." Peterson, however, did not make any threatening statements. Pfingsten stepped back when Peterson got out of the car. Pfingsten said that Peterson was 10–12 feet away when he started speaking. Pfingsten indicated that Peterson began moving towards him slowly.

Pfingsten testified that when Peterson was 5–6 feet away, he aimed at Peterson's chest and shot him twice, once in the chest and once in the back. Mrs. Peterson disputes this, indicating that Pfingsten was 14 feet away from Peterson at the time of the shooting.[2] Although the officers tried to revive Peterson, he died from the gunshot wounds due to loss of blood.

Baker testified that about half an hour after Pfingsten shot Peterson, he heard somebody say "Nice report" and heard "a little laughter afterwards."

Respondent David Maras, as trustee for the heirs of Peterson (the trustee), filed a

---

1. An alcohol test performed by the medical examiner indicated that Peterson's alcohol level was .25 at the time of his death.

2. Mrs. Peterson concedes that her head was turned at the time of the shooting. Just before she turned her head, she maintains that Peterson and Pfingsten were 14 feet apart.

complaint against Pfingsten, individually and as a peace officer for the Brainerd Police Department and Crow Wing County Sheriff's Department, Crow Wing County and the City of Brainerd. The trustee alleged that Pfingsten was negligent in firing his weapon at Peterson, that Pfingsten violated Peterson's civil rights under 42 U.S.C. § 1983 and that the City of Brainerd and County of Crow Wing were negligent in their training and supervision of Pfingsten. The trustee also commenced a dram shop action against respondents Richard Wetherall, d/b/a Iron Rail Saloon and Daniel Kuhn, d/b/a Dutch Room Bar.

The City of Brainerd (city) and Crow Wing County (county) brought motions for dismissal, and alternatively, for summary judgment on the ground that Pfingsten's actions were protected by governmental immunity and that there was no basis for a section 1983 cause of action. The district court denied their motions for summary judgment. The court also denied the trustee's motion to amend his complaint to allege assault and battery.

The county and the city filed separate appeals which have been consolidated. They appeal from the district court's order denying their motions for summary judgment on qualified, official and discretionary immunity grounds.

## ISSUES

1. Did the district court err in denying summary judgment on the trustee's 42 U.S.C. § 1983 (1988) claims?

(a) Did the trustee state a claim under section 1983?

(b) Did the trustee fail to plead or present evidence of a municipal practice, policy or custom?

2. Did the district court err in determining that Pfingsten is not entitled to qualified immunity?

3. Did the district court err in determining that Pfingsten is not entitled to official immunity on the trustee's common law tort claims?

4. Did the district court err in determining that the city and the county are not entitled to discretionary immunity pursuant to Minn.Stat. § 466.03, subd. 6 (1990), on the trustee's common law tort claims?

5. Did the district court err by determining that the trustee's claims are not barred by the doctrine of primary assumption of the risk?

6. Is the Crow Wing County Sheriff's Department a legal entity subject to suit?

## ANALYSIS

■ Ordinarily the denial of a summary judgment order is not appealable. However, the denial of summary judgment based on immunity is an appealable order. *Anderson v. City of Hopkins*, 393 N.W.2d 363, 364 (Minn.1986).

■ On appeal from summary judgment, the role of the reviewing court is to review the record for the purpose of answering two questions: (1) whether there are any genuine issues of material fact and (2) whether the trial court erred in its application of the law. *Offerdahl v. University of Minn. Hosps. & Clinics*, 426 N.W.2d 425, 427 (Minn.1988). Summary judgment is proper when no material issues of fact exist and one party is entitled to judgment as a matter of law. Minn.R.Civ.P. 56.03. The evidence must be viewed in a light most favorable to the non-moving party. *Hauser v. Mealey*, 263 N.W.2d 803, 805 n. 1 (Minn.1978).

I. *Section 1983*

■ The city and the county argue that the trustee's claims under 42 U.S.C. § 1983 must be dismissed in their entirety as a matter of law.

42 U.S.C. § 1983 (1988) provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Colombia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law, shall be liable to the party injured in an action at

law, suit in equity, or other proper proceeding for redress.

Section 1983 creates no substantive rights, but merely provides remedies for deprivation of rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985). A constitutional claim or a violation of a statute can be the basis for a section 1983 claim. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). Parties injured by constitutional abuses are entitled to recovery of monetary damages. *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 397, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619 (1971).

A. Stating a Claim under Section 1983

The county contends the trustee has failed to plead his section 1983 cause of action with specificity since the complaint fails to state specific allegations against Crow Wing County and the Crow Wing County Sheriff's Department. The trustee argues that he has properly stated a claim under section 1983 since he alleged Pfingsten was acting under color of state law and violated Peterson's rights under the United States Constitution or federal statutes.

 Only two allegations are necessary to state a cause of action under section 1983: (1) that a person has deprived the claimant of a federal right and (2) that the person so depriving acted under color of state law. *L.K. v. Gregg*, 425 N.W.2d 813, 818 (Minn.1988) (citing *Gomez v. Toledo*, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980)).

 In *Gregg*, the plaintiffs did not specifically mention section 1983 in their pleadings, did not specifically allege that respondents acted "under color of state law" and only alleged that the state's threatened actions would deprive them of due process of law as guaranteed by the Fourteenth Amendment. *Id.* at 818–19. The court, however, observed:

> [W]e consider the adequacy of the pleadings in light of their intended purpose. Under the Rules of Civil Procedure, only notice pleading is required. The rules do not require adherence to a mechanistic and rigid formula. Instead, the pleadings are liberally construed to insure that the defending party is given adequate notice of the claim. Similarly, in civil rights cases especially, pleadings should be liberally construed.

*Id.* at 819–20 (citations omitted). The court concluded:

> An allegation that the state's threatened actions would deprive the veterans of due process of law, as guaranteed under the fourteenth amendment, is clearly an allegation of a deprivation of a federal right.

*Id.* at 819.

Here, the trustee alleged that Pfingsten's actions deprived Peterson

> of rights and immunities under the laws and Constitution of the United States and the State of Minnesota, including, but not limited to, his rights under the Fourteenth Amendment to be secure in his person, to be free from punishment without due process, and to equal protection of the laws.

This is enough of an allegation of a deprivation of a federal right. *See Johnson v. Morris*, 453 N.W.2d 31, 35 n. 7 (Minn.1990) (an allegation of deprivation of "rights, privileges and immunities" under First and Fourteenth Amendments, without further specificity, was sufficient since the facts alleged stated a claim); *Elwood v. Rice County*, 423 N.W.2d 671, 675 (Minn.1988) (allegation of deprivation of rights without citing a particular constitutional provision is not fatal if the facts alleged statae a claim). The trustee also alleged that Pfingsten "was acting under color of law and his authority as a peace officer of the City of Brainerd and County of Crow Wing." Thus, the complaint meets the requirements of *Gregg* and properly states a claim against Pfingsten under section 1983.

B. Custom, Practice or Policy

The county argues that the trustee has failed to plead or present evidence of a custom, practice or policy of the county that violates any constitutional rights.

A municipality may, in certain circumstances, be held liable under section 1983 for its failure to train its employees. *City of Canton v. Harris*, 489 U.S. 378, 380, 109 S.Ct. 1197, 1200, 103 L.Ed.2d 412 (1989). The Court stated:

> [T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom police come into contact.

*Id.* at 380, 109 S.Ct. at 1204. Only where the municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be characterized as a city "policy or custom" actionable under section 1983. *Id.* at 389, 109 S.Ct. at 1205. The failure to train must be a "policy," as the Court has defined that term, and reflect a "deliberate" or "conscious" choice in order for a municipality to be liable. *Id.* The Court gave an example:

> [C]ity policy makers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n. 10, 109 S.Ct. at 1205 n. 10 (citations omitted).

Since the trustee has not presented any evidence of such an unconstitutional custom, practice or policy, the trial court erred in not granting the county summary judgment on the trustee's section 1983 claims.

## II. *Qualified Immunity*

Appellants claim that, even if the trustee's claims are actionable under section 1983, Pfingsten is entitled to qualified immunity against those claims.

Qualified or "good-faith" immunity is an affirmative defense available to public officials sued for damages under section 1983. *Elwood,* 423 N.W.2d at 674 (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2736, 73 L.Ed.2d 396 (1982)). The existence of a qualified immunity is purely a question of law. *Id.* at 675; *see also Johnson v. Morris,* 453 N.W.2d 31, 40 (Minn.1990) (issue of qualified immunity is appropriately resolved on summary judgment).

The standard for qualified immunity was set forth by the Supreme Court in *Harlow v. Fitzgerald:*

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738. Under *Harlow,* the focus is not whether questions of fact exist. *Reuter v. City of New Hope,* 449 N.W.2d 745, 750 (Minn.App. 1990), *pet. for rev. denied* (Minn. Feb. 28, 1990). The question is whether (1) the officer violated a particularized law at the time of the conduct, and (2) whether no reasonable officer would have acted similarly. *Id.* Qualified immunity should be recognized if officers of reasonable competence could disagree on the issue. *Elwood,* 423 N.W.2d at 675.

The threshold question is whether Peterson had a clearly established right which Pfingsten violated. We conclude that he did. The use of excessive force by a police officer may furnish the basis for a claim under section 1983. *Johnson,* 453 N.W.2d at 36. A claim of use of excessive force is to be reviewed for its reasonableness as a seizure of the person under the Fourth Amendment. *Id.* In evaluating the reasonableness of a seizure, courts are to consider

> the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight.

*Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989)).

■■■ Viewing the facts in a light most favorable to the trustee, we do not find the seizure reasonable under the circumstances and thus we hold Pfingsten's conduct violated a clearly established constitutional right. The question is whether any reasonable police officer could determine that Pfingsten was sufficiently threatened so as to justify the use of deadly force. We conclude Pfingsten was not sufficiently threatened. Peterson never raised the knife above his waist. None of the police officers felt that Mrs. Peterson was in any danger. Peterson was obviously intoxicated and could barely stand. As a whole, and viewing the facts in a light most favorable to the trustee, Peterson's actions were relatively benign and did not justify the use of deadly force. Thus the district court properly denied the city and county's summary judgment motion on the issue of qualified immunity.

### III. *Official Immunity Doctrine*

The city and the county contend that Pfingsten is entitled to immunity from suit against the trustee's common law tort claims under the official immunity doctrine.

■■■ The doctrine of official immunity protects from personal liability a public official charged by law with duties that call for the exercise of judgment. *Rico v. State*, 472 N.W.2d 100, 106–07 (Minn.1991). To have official immunity (1) the challenged acts must have occurred in the exercise of the officer's discretion, and (2) the officer must not have committed a willful or malicious wrong. *Elwood*, 423 N.W.2d at 677.

■■■ The trustee argues that Pfingsten is not entitled to official immunity since his conduct was not discretionary. In defining the scope of official immunity, the supreme court distinguishes between discretionary duties, which are immunized, and ministerial duties, for which the officer

remains liable. *Rico*, 472 N.W.2d at 107. The court has described an official's duty as ministerial

when it is absolute, certain and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.

*Id.* (quoting *Cook v. Trovatten*, 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)). Police officers are generally classified as discretionary officers entitled to official immunity. *Johnson*, 453 N.W.2d at 42. The trustee contends that Pfingsten's duty to avoid using deadly force in apprehending a misdemeanant was absolute, and thus his actions were ministerial. In making the decision to use deadly force however, it is necessary for a police officer to determine whether a felony is in progress and whether the officer or another person is in imminent danger. Such a decision necessarily involves the exercise of judgment or discretion. *See Elwood*, 423 N.W.2d at 677. Thus we hold that the decision whether to use deadly force is properly characterized as discretionary. Consequently, Pfingsten is entitled to official immunity if he did not commit a willful or malicious wrong.

■■■ The city argues that there are no intentional tort claims in the trustee's complaint, and thus he cannot invoke the willful or malicious wrong exception. Malice

means nothing more than the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right.

*Rico*, 472 N.W.2d at 107 (quoting *Carnes v. St. Paul Union Stockyards Co.*, 164 Minn. 457, 462, 205 N.W. 630, 631 (1925)). In the official immunity context, willful and malicious are synonymous. *Id.* Liability will attach when a police officer intentionally commits an act which the officer, at the time of the act, has reason to believe is wrong. *Id.* Whether or not an officer acted willfully or maliciously is usually a question of fact to be resolved by the jury. *Johnson*, 453 N.W.2d at 42. We inquire whether a genuine issue of material fact exists as to whether Pfingsten's actions

could constitute a willful or malicious wrong. *See Rico*, 472 N.W.2d at 107.

 It is true the district court denied the trustee's motion to amend his complaint to allege assault and battery. There is, however, no dispute that Pfingsten acted intentionally in shooting Peterson. The city and county never allege Pfingsten accidentally pulled the trigger or that the gun accidentally discharged—they merely argue he intentionally shot Peterson in response to a perceived threat. *Cf. Carlisle v. City of Minneapolis*, 437 N.W.2d 712, 716 (Minn.App.1989) (when decedent lunged at police officer, decedent's head inadvertently impacted with the muzzle of the officer's shotgun, causing it to fire and kill him and there was no evidence the officer intentionally discharged the shotgun). It is also clear that Pfingsten was aware of state and city policy regarding the use of deadly force. Under *Rico*, these two facts are sufficient to let the jury decide whether his actions constituted a willful or malicious wrong. Thus, we hold Pfingsten is not entitled to official immunity.

## IV. *Discretionary Immunity*

The city claims it is entitled to discretionary immunity pursuant to Minn.Stat. § 466.03, subd. 6 (1990), as to the trustee's common law tort claims. The city does not claim that Pfingsten's actions are protected by discretionary immunity. Rather, it only asserts the defense with regard to the negligence claims asserted directly against the city.

 Minn.Stat. § 466.03, subd. 6 establishes that a municipality is immune from tort liability for

[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused.

In analyzing the discretionary function exception, the supreme court has distinguished between "planning" decisions (which are discretionary and protected) and "operational" decisions (which are not discretionary and are not protected). Planning level decisions are those involving questions of public policy, that is, the evaluation of factors such as the political, economic and social effects of a given plan or policy. *Holmquist v. State*, 425 N.W.2d 230, 232 (Minn.1988). Operational decisions are those relating to ordinary day-to-day operations of the government. *Id.*

 The critical inquiry is whether the challenged governmental conduct involved a balancing of policy objectives. *Nusbaum v. County of Blue Earth County*, 422 N.W.2d 713, 722 (Minn.1988). Not all acts involving the exercise of judgment by government agents are protected as discretionary functions. *Id.* The protection afforded by the discretionary function exception does not extend to professional or scientific judgment where such judgment does not involve a balancing of policy objectives. *Id.* Instead, "government conduct is protected only where the state produces evidence that the conduct was of a policy-making nature involving social, political, or economic considerations." *Id.*

 We agree that the training a city provides to its police officers is a policy decision. The city must decide what kinds of training the officers need and must take into account the resources the city has to pay for such training. Thus, the city is protected by discretionary immunity.

## V. *Primary Assumption of the Risk*

The city argues that the trustee's claims are absolutely barred by the doctrine of primary assumption of the risk.

 Primary assumption of the risk arises

[w]here parties have voluntarily entered a relationship in which plaintiff assumes well-known, incidental risks. As to those risks, the defendant has no duty to protect the plaintiff and, thus, if the plaintiff's injury arises from an incidental risk, the defendant is not negligent.

*Olsen v. Hansen*, 299 Minn. 39, 44, 216 N.W.2d 124, 127 (1974). If the plaintiff's injuries do not arise from such risks, however, the defendant does have a duty and may be found negligent. *Wagner v.*

*Thomas J. Obert Enters.*, 384 N.W.2d 477, 481 (Minn.App.1986), *rev'd on other grounds*, 396 N.W.2d 223 (Minn.1986). Primary assumption of risk is an absolute bar to the plaintiff's recovery. *Armstrong v. Mailand*, 284 N.W.2d 343, 348 (Minn.1979).

▮▮▮▮▮ The elements of primary assumption of the risk are whether a person had (1) a knowledge of the risk, (2) an appreciation of the risk, and (3) a choice to avoid the risk but voluntarily chose to chance the risk. *Andren v. White–Rogers Co.*, 465 N.W.2d 102, 104 (Minn.App.1991), *pet. for rev. denied* (Minn. Mar. 27, 1991). As the district court noted, Peterson was clearly intoxicated and it cannot be shown he had the means of comprehending the danger. If he could not appreciate the risk, he could not voluntarily choose to take the risk. Thus, the trustee's claim should not be barred on this basis.

## VI. *Legal Entity*

The county argues that the Crow Wing County Sheriff's Department is not a legal entity subject to suit and that claims against it must be dismissed.

▮▮▮▮ Since Crow Wing County sheriff's department is not a "person," the claims against it should be dismissed. *See In re Scott County Master Docket*, 672 F.Supp. 1152, 1163 n. 1 (D.Minn.1987) (sheriff's department "not legal entit[y] subject to suit; therefore, claims against it must be dismissed"), *aff'd, Myers v. Scott County*, 868 F.2d 1017 (8th Cir.1989).

## DECISION

The district court properly determined that the trustee stated a claim against Pfingsten under 42 U.S.C. § 1983. The district court erred in not granting the county summary judgment since the trustee produced no evidence of an unconstitutional practice or policy. The court properly determined Pfingsten was not entitled to qualified or official immunity. The court improperly refused to grant the city discretionary immunity regarding its decisions to train its police officers. The court properly determined the primary assumption of the risk doctrine is inapplicable. The Crow Wing County sheriff's department is not a legal entity subject to suit.

**Affirmed in part, reversed in part and remanded.**