# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1126

_____

Ivan Swearingen, Administrator of the Estate of Ryan James Swearingen; Ronda Swearingen, Administrator of the Estate of Ryan James Swearingen,

*Plaintiffs - Appellants*,

v.

Karl Judd, Individually, and in his Official Capacity as a Police Officer for the City of Fort Madison, Iowa,

*Defendant - Appellee*.

_____

Appeal from United States District Court
for the Southern District of Iowa - Davenport

_____

Submitted: January 14, 2019
Filed: July 18, 2019

_____

Before SMITH, Chief Judge, COLLOTON and ERICKSON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

This case arises from a police shooting in which a suspect was killed. The administrators of the decedent's estate sued the police officer who fired the fatal shots, alleging that he violated the decedent's constitutional rights by using

unreasonable force. The district court[1] concluded that the officer's use of force was objectively reasonable and granted summary judgment for the officer. We conclude that the officer is entitled to qualified immunity, and therefore affirm the judgment.

I.

During the summer of 2014, Ryan Swearingen, aged 27, and his three children attended a family cookout at the home of his parents, Ivan and Ronda Swearingen, in Fort Madison, Iowa. Ryan and his children planned to spend the night at his parents' home on August 2.

Around 1:16 a.m. on August 3, Fort Madison police captain James Carle spoke with his girlfriend by cell phone while he worked the night shift. Carle's girlfriend reported seeing a man walking outside the house that she shared with Carle. She described him walking into their backyard and then into a back alleyway, where he started slashing the tires of several parked vehicles with a knife.

Carle drove his patrol car to the alleyway and saw a male bent over the rear driver's side tire of Carle's personal vehicle. Upon seeing Carle, the man ran down the alleyway in the opposite direction. Carle pursued the man by car and then on foot. During the pursuit, Carle used his radio to request assistance from other officers.

Around 1:46 a.m., Carle saw the suspect enter the Swearingen residence and lock the back door. Carle notified police dispatch that he was at the Swearingen residence, and he started pounding on the back door demanding that the suspect unlock it.

---

[1]The Honorable James E. Gritzner, United States District Judge for the Southern District of Iowa.

Within minutes, several officers arrived at the home. Officers Smajlovic and Riggs moved to the front of the house to prevent anyone from escaping. Carle maintained his position at the back entrance, where he was joined by Officer Karl Judd and Officer Hartman.

Awakened by the barking of the family dog, Ivan went to the back laundry room and saw uniformed police officers banging on the door and pointing their firearms at him. Ronda, also awakened, went to the kitchen. Both Ivan and Ronda saw Ryan holding at least one knife as he moved around the first floor of the house. Through the window in the back door, officers also could see Ryan holding at least one knife. They yelled at Ryan to put the knife down, but he did not.

Smajlovic and Riggs eventually entered the unlocked front door and made their way through the front living room and into the dining room, which opened into the kitchen. Once in the dining room, Smajlovic could see through the kitchen and laundry room to the back entrance, where Carle and the other officers were pounding on the door. Smajlovic saw Ryan holding a green-handled knife and standing to the left of the back door. He unholstered his pistol, pointed it at Ryan, and yelled, "Drop the knife." Ryan did not acknowledge Smajlovic's order. As Smajlovic and Riggs entered the kitchen, Ivan blocked their path. Seeing that Ivan was unarmed, Smajlovic holstered his pistol and used an empty-hand maneuver to engage with him.

As Ivan blocked Smajlovic's advance, Ryan walked through the kitchen and into a side bedroom. There, he entered an adjoining walkthrough closet, which connected back to the laundry room near the back door. Meanwhile, the officers at the back entrance gained entry by breaking the window in the door and opening it from within.

Carle entered the house first, followed by Judd and Hartman. Carle and Judd each had their service pistols unholstered, and Hartman drew his taser. As Judd

moved through the laundry room and toward the kitchen, he noticed the closet door to his right move and saw that it was cracked open. At the same time, Riggs pointed his taser's laser sight toward the opening and called out, "The door moved. Somebody is in behind that door."

Judd opened the closet door with his right hand as he held his pistol in his left. Ryan was standing behind the closet door with a knife. Judd quickly stepped back and fired three shots that struck Ryan in his left arm and lower back. Ryan and Judd were about two to three feet apart when Judd fired.

Accounts differ as to Ryan's position within the closet at the time of the shooting. Judd alleges that Ryan held the knife in a "dagger position" at the right side of his face and took a step toward Judd, as if to lunge at him. Hartman caught sight of Ryan as he came from behind Judd, with his taser's laser sight focused on Ryan's left shoulder. Hartman later testified that Ryan was holding the knife at his side in a reverse grip, with the blade pointed toward his elbow as he fell to the ground. Ivan describes seeing the left side of Ryan's torso facing the kitchen as the closet door opened, but he could not see Ryan's right hand. After the shooting, Riggs approached the closet and saw a green-handled knife underneath Ryan's arm, with the blade pointed toward his body.

Ryan died at a local hospital. Medical reports found that the three bullets followed a left-to-right, back-to-front trajectory when they entered Ryan's body.

As administrators of Ryan's estate, Ivan and Ronda Swearingen sued police officers Judd and Carle, and the City of Fort Madison, under 42 U.S.C. § 1983, alleging constitutional violations during the incident. The only claim at issue on this appeal is an allegation that Judd used unreasonable force in violation of the Fourth and Fourteenth Amendments when he shot Ryan. The district court, citing *Smith v. City of Brooklyn Park*, 757 F.3d 765, 772-75 (8th Cir. 2014) (per curiam), and *Estate*

*of Morgan v. Cook*, 686 F.3d 494, 496-98 (8th Cir. 2012), ruled that Judd's use of force was reasonable under the circumstances, given the threat that Ryan posed to Judd and others in the house. The court therefore granted summary judgment for the officer and dismissed the claim.

II.

Qualified immunity protects government officials from suit under § 1983 if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To prevail against a claim of qualified immunity, a plaintiff must show (1) that the facts alleged or shown by the plaintiff make out a constitutional violation, and (2) that the constitutional right allegedly violated was "clearly established." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

For a right to be "clearly established," the law must have been sufficiently clear that every reasonable official would have understood that his actions violated that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). A plaintiff need not always identify "a case directly on point," but "controlling authority" or "a robust 'consensus of cases of persuasive authority'" must put "the statutory or constitutional question beyond debate." *Id.* at 741-42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). "The dispositive question is whether the violative nature of *particular* conduct is clearly established." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (internal quotation omitted). This "demanding standard" shields the conduct of "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The Swearingens allege that Judd's discharge of his firearm violated Ryan's Fourth Amendment right to be free from an unreasonable seizure accomplished by an

excessive use of force. We need not decide whether Judd's use of force was objectively reasonable because, at a minimum, Judd did not violate a clearly established right under the Fourth Amendment. It was not clearly established in August 2014 that an officer was forbidden to discharge his firearm when suddenly confronted in close quarters by a noncompliant suspect armed with a knife.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The Swearingens argue that the facts and circumstances here show that Judd's use of force was unreasonable, and that previous judicial decisions made the unreasonableness clear. They emphasize that when the facts are taken in the light most favorable to the plaintiffs, Ryan was suspected only of slashing tires (not of a violent offense against persons), Judd was accompanied in the home by several armed officers, Ryan held the knife down at his side with the blade pointing toward his elbow, Ryan did not lunge toward Judd, and Judd discharged his weapon without issuing a command to Ryan after locating him in the closet. As supporting authority, they cite this court's statement in *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009), that "[g]eneral statements of the law are capable of giving clear and fair warnings to officers even where the very circumstances confronting the officers [have] not previously been addressed." *Id.* at 611 (first alteration in original) (internal quotation

-6-

omitted). And they point to this court's observation that at least since *Tennessee v. Garner*, 471 U.S. 1 (1985), "officers have been on notice that they may not use deadly force unless the suspect poses a significant threat of death or serious physical injury to the officer or others." *Craighead v. Lee*, 399 F.3d 954, 962 (8th Cir. 2005).

We conclude that these facts and authorities are insufficient to establish the violation of a clearly established right. Although general propositions about use of deadly force were clearly established, and a plaintiff need not cite a prior decision with identical facts, "the clearly established law must be particularized to the facts of the case" and not "defined at a high level of generality." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam) (internal quotation omitted). While the Swearingens identify some factors militating against a need for deadly force in this instance, it remains undisputed that Judd was suddenly confronted, at a distance of only three feet, with a suspect who was armed with a knife after ignoring multiple commands to drop it. Accepting for purposes of summary judgment that Ryan was neither advancing toward Judd nor holding the knife with the blade directed at the officer, the suspect still had been noncompliant and could have caused serious injury or death in a matter of seconds by repositioning himself and the knife. The situation is fairly described as tense and rapidly evolving. Even if Judd should have attempted to apprehend Ryan without firing his weapon, the officer's actions sit along the "hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 206 (2001) (internal quotation marks omitted). Under these circumstances, we cannot say that Judd's use of deadly force, even if just over the line of reasonableness, violated a clearly established right. *Cf. Parks v. Pomeroy*, 387 F.3d 949, 957-58 (8th Cir. 2004).

The judgment of the district court is affirmed.

ERICKSON, Circuit Judge, concurring in the judgment.

Viewing the evidence in the light most favorable to the Swearingens, I believe Judd's mistaken perception or belief that Ryan posed a threat of serious physical harm to Judd or any of the other officers was objectively reasonable in this particular case due to the close proximity between the officers and Ryan, and because the positioning of the knife was such that it that could have been readily modified to pose an imminent threat to the officers.  See Estate of Morgan v. Cook, 686 F.3d 494, 497-98 (8th Cir. 2002).  I, therefore, concur in the judgment.

_____