# United States Court of Appeals
### For the Eighth Circuit
_____

No. 24-1728
_____

Amity Dimock, Trustee for the Heirs and Next of Kin of Kobe Dimock-Heisler

*Plaintiff - Appellant*

v.

City of Brooklyn Center; Brandon Akers, in their individual and official capacities; Steve Holt, in their individual and official capacities; Cody Turner, in their individual and official capacities; Joseph Vu, in their individual and official capacities

*Defendants - Appellees*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: October 23, 2024
Filed: December 26, 2024
_____

Before GRUENDER, BENTON, and KOBES, Circuit Judges.
_____

BENTON, Circuit Judge.

Amity Dimock—the mother of Kobe E. Dimock-Heisler—sued the City of Brooklyn Center and four officers in their individual and official capacities, alleging unconstitutional warrantless entry and unconstitutional use of deadly force. The

defendants moved for summary judgment.  The district court[1] granted summary judgment to the officers based on qualified immunity.  Dimock appeals.  Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

On summary judgment, this court views the evidence and draws all reasonable inferences most favorably to the nonmoving party.  *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022).  However, only facts that are genuinely disputed are viewed most favorably to the nonmovant.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).  A fact is not genuinely disputed if a party's story is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Here, due to footage of the encounter from the officers' body cameras, there are few disputed facts.  For the defense of qualified immunity, the only facts considered are those "that were knowable to the defendant officers."  *White v. Pauly*, 580 U.S. 73, 77 (2017).

On August 31, 2019, Erwin B. Heisler called 911, saying that his grandson had threatened him with a knife and hammer.  After answering questions for about one minute, Heisler hung up, saying "Oh, forget it."  From dispatch, officers learned that a 21-year-old man was fighting with his grandfather, that he had a hammer and a knife, and that Heisler called 911, said "Oh, forget it," and hung up.  Several officers arrived at Heisler's house.  Four officers—Brandon Akers, Cody Turner, Steve Holt, and Joseph Vu—approached the front door.  Walking there, Officer Turner told Officer Akers that Kobe had stabbed himself earlier that year.

Opening the front door, Heisler stepped onto the front steps to meet the officers.  Officer Akers greeted him and asked, "What's going on tonight?" Obviously referring to Kobe, Heisler told the officers, "He's going to be okay."

---

[1]The Honorable Donovan W. Frank, U.S. District Judge for the District of Minnesota.

Officer Akers, a few feet from the front step, asked Heisler who was in the house. Heisler replied, his wife (Kobe's grandmother), himself, and Kobe. Officer Akers said, "Ok. We gotta make sure that everybody's okay before we leave. I get families have disturbances and stuff like that." Peering through a window, Officer Turner pinpointed Kobe sitting in the front room. Heisler said "ok," turned, and reentered his home. Officer Akers asked Heisler if Kobe had any weapons on him. Heisler responded, "No." From inside the entryway, Heisler told his wife, "They just want to make sure everything is okay."

Heisler stood silently within the entryway as the four officers entered the home. Officer Akers asked Heisler to speak with him outside. They walked out to the driveway. Officers Holt and Vu began speaking with Kobe in the front room. Also sitting there, Kobe's grandmother had the weapons collected in a bag. She gave the knife to Officer Turner when he asked for it. Later, she gave him the hammer when asked. Officer Turner walked out to the driveway to speak with Heisler, who told Officers Akers and Turner that Kobe was afraid of being hospitalized.

Talking with Heiser, Officers Akers and Turner heard commotion from inside the house. The officers ran in there. Officers Holt and Vu were trying to restrain Kobe on a couch. It tipped over. Officer Holt rolled over the couch and out of the front door. Officers Turner and Akers deployed their tasers against Kobe, which did not immobilize him. Instead, Kobe got a knife in his hand (not the one that Kobe's grandmother gave the officers). Kobe tried to run back further into the house. Officer Vu grabbed his legs. Kobe fell to the floor. Officer Holt reentered the house.

Officer Akers asked, "What's he got, a knife?" Officer Turner shouted, "Knife, Knife, Knife!" It is disputed whether Kobe was stabbing and slashing at Officer Vu with the knife. Because the body-camera footage does not clearly resolve this dispute, this court infers that Kobe was only holding the knife. Officer Vu began to stand up. Viewing the facts most favorably to Dimock, Kobe began to stand back up to run away, with the knife in his right hand and one foot underneath him. To

leave the room, Kobe would have had to run right by at least one of the officers. Kobe was directly in front of his grandmother, who was seated. Officer Turner fired three shots. Officer Akers also fired three shots. Their bullets killed Kobe.

Applying qualified immunity, the district court determined that a reasonable officer would have believed that exigent circumstances justified entry. *Dimock v. City of Brooklyn Center*, 2024 WL 991361, at \*5 (D. Minn. Mar. 7, 2024). The district court also concluded that Officer Turner and Officer Akers "had probable cause to believe that Kobe posed an immediate threat of death or serious bodily injury to others at that point, which justified their use of deadly force." *Id.* at \*8. The district court granted summary judgment, dismissing all of Dimock's claims. Dimock appeals the dismissal of her claims against the officers in their individual capacities.

## II.

This court reviews de novo a district court's decision on summary judgment. *Torgerson*, 643 F.3d at 1042. Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed. R. Civ. P. 56(a)**. Qualified immunity bars suits against officials in their individual capacities so long as officials did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White*, 580 U.S. at 78-79. If qualified immunity applies, then summary judgment is proper here because Dimock cannot sue the officers in their individual capacities.

"A right is 'clearly established' when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). A clearly established right is dictated either by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Existing precedent can clearly establish a right, even if there is not a case "directly

-4-

on point," so long as existing precedent places the question "beyond debate." *Id.* at 64. "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 63.

The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." **U.S. Const.** amend. IV. Summary judgment is proper here if not all reasonable officers would, under the facts knowable to them in this case, be aware that their conduct here violated the Fourth Amendment.

This court need not decide whether the officers' conduct here actually violated constitutional rights. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). *See also Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019). Instead, this case is resolved by answering the question of whether the rights asserted were clearly established.

III.

Dimock argues that the officers' warrantless entry into the home violated the Fourth Amendment because it was an unreasonable search. Generally, warrantless entry into a home is an unreasonable search. *Payton v. New York*, 445 U.S. 573, 586 (1980). Several exceptions exist. As relevant here, if exigent circumstances exist, then officers may enter a home without a warrant or even probable cause. *United States v. Quarterman*, 877 F.3d 794, 800 (8th Cir. 2017).

Exigent circumstances may justify the officers' entry into the home. Exigent circumstances exist when officers "have an objectively reasonable basis that some immediate act is required to preserve the safety of others or themselves." *Id.* The reasonableness of an entry under exigent circumstances turns not on any officer's subjective state of mind, but objectively on the circumstances surrounding the entry. *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006). If the officers here had an objectively reasonable basis to believe that someone in the house needed immediate

-5-

aid, then their entry into the house did not violate the Fourth Amendment. *See Quarterman*, 877 F.3d at 797.

Heisler told the officers that his wife and Kobe were inside the house. In determining the reasonableness of an officer's concern for safety, this court recognizes that "domestic disturbances are highly volatile and involve large risks." *Id.* at 798. Officers knew that Kobe had threatened his grandfather earlier that day with a knife and hammer. This court "has consistently found exigent circumstances where officers reasonably believe a gun or an armed individual presents a danger to others or themselves." *Id.* (collecting cases).

On the other hand, the weapons the officers knew about were a knife and a hammer, not a gun. *Cf. id.* Also, the presence of a weapon inside the home does not necessarily create exigent circumstances. *United States v. Murphy*, 69 F.3d 237, 243 (8th Cir. 1995). And the officers here did not see Kobe make any quick movements before they entered Heisler's home. *Cf. Quarterman*, 877 F.3d at 797 (holding that exigent circumstances existed when officers reasonably believed that defendant was armed and that there was an ongoing domestic dispute between him and his girlfriend, and then he made "quick movements" while officers could not see the gun). The arrest of a suspect in a domestic dispute does not necessarily justify warrantless entry when no facts indicate that the suspect is a threat to others. *Smith v. Kansas City Police Dep't*, 586 F.3d 576, 580 (8th Cir. 2009).

However, officers here may have had a reasonable basis to believe that Kobe was a threat to others. They knew he threatened his grandfather with weapons earlier that day. *Cf. Quarterman*, 877 F.3d at 799 (holding that, because officers knew Quarterman was carrying a gun while making his girlfriend move out of his apartment and that he had earlier that day been in a heated verbal altercation with his girlfriend's mother, "officers had an objectively reasonable basis to believe that Quarterman was armed and a threat to [his girlfriend] or others"). Officers Turner and Akers also knew that Kobe had the potential for violence because he had previously stabbed himself earlier that year. Under existing precedent, not every

reasonable officer would know that Kobe being inside the house with his grandmother did not constitute exigent circumstances. *See also **Cotten v. Miller***, 74 F.4th 932, 935 (8th Cir. 2023) (granting qualified immunity to officers for their warrantless entry of an apartment when they "had reasonable grounds to believe that a domestic violence suspect was still inside the home with a putative victim").

Dimock argues that officers could not have reasonably believed that Kobe was armed and dangerous because Heisler said "Oh, forget it" on his 911 call, told the officers that Kobe would "be okay," and told them that Kobe did not have any weapons on him. But officers can reasonably disbelieve individuals. Due to the nature of domestic disputes, "an officer need not take a putative victim's statement at face value when assessing whether a suspect presents an ongoing threat to the victim." ***Id.*** (holding that officers were reasonable in entering a residence, even though the putative victim denied that there had been any domestic violence, and the officers had no evidence of weapons inside the residence).

The key to exigent circumstances is what officers reasonably believe. ***Quarterman***, 877 F.3d at 798-99. Faced with the facts here, not every reasonable officer would know that it was unreasonable to believe that some immediate act was necessary to protect the safety of Kobe's grandmother or themselves. Not every reasonable officer would know, in the particular circumstances of this case, that entering the house violated the Fourth Amendment. The right was not "clearly established." ***Rivas-Villegas***, 595 U.S. at 5. The district court correctly granted qualified immunity on the officers' warrantless entry.

IV.

Dimock argues that Officers Turner and Akers are not entitled to qualified immunity for their use of deadly force against Kobe. The use of deadly force to restrain a person is a seizure under the Fourth Amendment. ***Tennessee v. Garner***, 471 U.S. 1, 7 (1985). Objectively unreasonable uses of deadly force violate the Fourth Amendment. ***Graham v. Connor***, 490 U.S. 386, 397 (1989). "The key

-7-

question is 'whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" ***Nance v. Sammis***, 586 F.3d 604, 610 (8th Cir. 2009).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ***Graham***, 490 U.S. at 396. This court evaluates the reasonableness of an officer's use of deadly force by looking primarily at the threat present *at the time* the force is deployed. ***Banks v. Hawkins***, 999 F.3d 521, 525-26 (8th Cir. 2021). Determining whether an officer used reasonable force "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." ***Graham***, 490 U.S at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." ***Id.*** at 396-97; ***Swearingen***, 930 F.3d at 987-98.

"To begin, 'absent probable cause' for an officer to believe the suspect poses 'an immediate threat of death or serious bodily injury' to others, 'use of deadly force is not objectively reasonable.'" ***Cole Estate of Richards v. Hutchins***, 959 F.3d 1127, 1132 (8th Cir. 2020). Precedent puts officers "on notice . . . that they may not use deadly force under circumstances in which they should know that the suspect does not present an immediate threat of serious physical injury or harm." ***Craighead v. Lee***, 399 F.3d 954, 963 (8th Cir. 2005). *See also **Nance***, 586 F.3d at 611.

The Supreme Court emphasizes: "Specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." ***Kisela v. Huges***, 584 U.S. 100, 104 (2018). Because use of excessive force is an area of the law "in which the result depends

very much on the facts of each case," qualified immunity applies "unless existing precedent 'squarely governs' the specific facts at issue." *Id.* "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" *Id.* at 105.

No precedent of the Supreme Court or this circuit squarely governs the specific facts of this case. Kobe was holding a knife, so this case is distinguishable from cases where the person shot was unarmed. *See, e.g.*, **Banks**, 999 F.3d at 524. *See also* **Marks v. Bauer**, 107 F.4th 840, 849 (8th Cir. 2024). Dimock cites cases where it was unreasonable for an officer to use deadly force against a person holding a gun when that person had not yet pointed the gun at anyone or taken some other "menacing action." **Cole Estate of Richards**, 959 F.3d at 1132. *See also* **Partridge v. City of Benton**, 929 F.3d 562, 565-66 (8th Cir. 2019); **Craighead**, 399 F.3d at 959; **Nance**, 586 F.3d at 610-11. Dimock argues that the same analysis applies to Kobe's holding of the knife because a knife is less dangerous than a gun. Viewing the facts most favorably to Dimock, Kobe did not take a menacing act with the knife. But a person at close distance holding a knife, even if not directing the blade at another person, could still cause "serious injury or death in a matter of seconds by repositioning himself and the knife." **Swearingen**, 930 F.3d at 988.

Dimock argues that Kobe's mental health and fear of hospitalization should influence the reasonableness of the officers' use of deadly force against him. *Cf.* **Ludwig v. Anderson**, 54 F.3d 465, 473-74 (8th Cir. 1995) (denying qualified immunity for officers who, without an immediate warning, used deadly force against a man who seemed emotionally disturbed, wielded a knife, was trying to run away from officers in an outdoor area with bystanders 150 feet away, and was not running toward the bystanders). But the reasonableness of an officer's use of deadly force does not always differ based on what the officer knows about a person's mental state. *Id.* at 472 (holding only that "emotionally disturbed status *may* be relevant to the trial court's determination of objective reasonableness") (emphasis added). *See also* **Hassan v. City of Minneapolis**, 489 F.3d 914, 919 (8th Cir. 2007) (holding that a

suspect's "mental state does not change the fact he posed a deadly threat to the officers and the public"). Also, *Ludwig v. Anderson* was a "close" case. **Ludwig**, 54 F.3d at 473. It did not clearly establish a right that the officers violated by their use of deadly force against Kobe.[2] *See generally* **Sok Kong Trustee for Map Kong v. City of Burnsville**, 960 F.3d 985, 992-95 (8th Cir. 2020) (distinguishing *Ludwig*).

An officer has probable cause to believe that a man poses an immediate threat of serious physical harm when the man has a knife, ignores repeated orders to drop the knife, stands up "with the knife pointed downward and his arm at his side," and raises his right leg as if to take a step toward an officer who is at most 12 feet away. **Estate of Morgan v. Cook**, 686 F.3d 494, 496-97 (8th Cir. 2012). Dimock tries to distinguish the facts here from *Estate of Morgan v. Cook*, spotlighting that Kobe's body position was away from the officers rather than toward them. But Kobe was facing his grandmother as he stood up, and to run out of the room Kobe would have had to face at least one of the officers. Kobe was within a few steps of his grandmother and each of the officers. *Cf.* **Swearingen**, 930 F.3d at 988 (applying qualified immunity to an officer who used deadly force when "suddenly confronted, at a distance of only three feet, with a suspect who was armed with a knife after ignoring multiple commands to drop it"). It is undisputed that Kobe moved with the knife in his hand. It is undisputed he had struggled with the officers. It is undisputed that Officers Turner and Akers knew he stabbed himself earlier that year. Even with the disputed facts construed most favorably to Dimock, not all reasonable officers here would have known that they lacked probable cause to believe Kobe "posed an

---

[2]Likewise, a right is not clearly established here by *Maras v. City of Brainerd*, 502 N.W.2d 69, 77 (Minn. App. 1993). First, one state appellate case is not a "robust" consensus of persuasive authority that clearly establishes a right. *See* **Lane v. Nading**, 927 F.3d 1018, 1023 (8th Cir. 2019). Second, *Maras* is distinguishable. There, a court held it unreasonable for an officer to shoot a man who was holding a knife but never raised it above his waist, was obviously intoxicated, and could barely stand. **Maras**, 502 N.W.2d at 77. Here, Kobe was not obviously intoxicated and did not have trouble moving. Also, the man in *Maras* was 14 feet away from the officer who shot him. **Id.** at 73. Here, Kobe was within a few steps of his grandmother and the officers.

immediate threat of serious physical harm" to his grandmother or to themselves. *Estate of Morgan*, 686 F.3d at 497. *See also Kisela*, 584 U.S. at 101 (granting qualified immunity to an officer who shot a woman who had been acting erratically, was holding a large kitchen knife, had walked toward another woman and stopped no more than six feet from her, and ignored at least two orders to drop the knife).

Dimock emphasizes that the officers never warned Kobe that they would use deadly force if he did not drop the knife. Officers did tell Kobe multiple times to "Get down on the ground." *See generally Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) (quoting warnings from several cases). True, "[w]hen a warning is feasible, the failure to warn 'adds to the unreasonableness' of the use of deadly force." *Cole Estate of Richards*, 959 F.3d at 1133. *See also Garner*, 471 U.S. at 11-12; *Estate of Morgan*, 686 F.3d at 498 (highlighting that the officer there drew his pistol, pointed it at the suspect, and repeatedly ordered him to drop the knife); *Swearingen*, 930 F.3d at 986 (noting that officers told the suspect multiple times to drop the knife). But, although failure to feasibly warn does "'exacerbate the circumstances' and mitigates against finding use of deadly force objectively reasonable," it does not "'automatically' render use of deadly force unreasonable." *Cole Estate of Richards*, 959 F.3d at 1133. Precedent did not clearly establish that the officers' failure to explicitly warn Kobe made their use of deadly force against him unreasonable.

Dimock concludes that a reasonable jury could find a violation of Kobe's Fourth Amendment right against unreasonable use of deadly force. But even if the officers' use of force was "over the line of reasonableness," that does not mean the right they violated was clearly established. *Swearingen*, 930 F.3d at 988. The "right's contours" were not "sufficiently definite" at the time of the shooting that "any reasonable official in the defendant's shoes would have understood that he was violating it." *Kisela*, 584 U.S. at 105. Not every reasonable officer would have understood that the use of deadly force here violated the Fourth Amendment. The right was not "clearly established." *Rivas-Villegas*, 595 U.S. at 5. The district court correctly granted qualified immunity on the officers' use of deadly force.

-11-

* * * * * * *

The judgment is affirmed.

_____