# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-1101
_____

Sok Kong, Trustee for Next-of-Kin of Map Kong, Decedent

*Plaintiff - Appellee*

v.

City of Burnsville; Maksim Yakovlev, in his individual and official capacity; John Mott, in his individual and official capacity; Taylor Jacobs, in his individual and official capacity

*Defendants - Appellants*
_____

Appeal from United States District Court
for the District of Minnesota
_____

Submitted: February 11, 2020
Filed: May 29, 2020
_____

Before LOKEN, BENTON, and KELLY, Circuit Judges.
_____

BENTON, Circuit Judge.

Map Kong was fatally shot by police in Burnsville, Minnesota. His next-of-kin's Trustee, Sok Kong, sued the City of Burnsville and the officers who shot him—Maksim Yakovlev, John Mott, and Taylor Jacobs—under 42 U.S.C. § 1983 and state law. The district court denied the defendants' motion for summary judgment

invoking qualified immunity and official immunity. They appeal. Having jurisdiction under 28 U.S.C. § 1291, this court reverses and remands.

I.

This court states "the facts that the district court specifically found were adequately supported, along with those facts that the district court likely assumed." *Brown v. Fortner*, 518 F.3d 552, 557-58 (8th Cir. 2008). "When there are questions of fact the district court did not resolve, we determine the facts that it likely assumed by viewing the record favorably to the plaintiff as in any other summary judgment motion." *Id.* at 558. *See also* *Tolan v. Cotton*, 572 U.S. 650, 657 (2014); *Walton v. Dawson*, 752 F.3d 1109, 1116 (8th Cir. 2014). However, this court does not adopt the plaintiff's version if it is "blatantly contradicted by the record." *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Almost all the facts here come from the body cameras of four officers. *Kong v. City of Burnsville*, 2018 WL 6591229, at *1 (D. Minn. Dec. 14, 2018).

At 6:16 am on March 17, 2016, dispatch alerted officers Taylor Jacobs and John Mott about "suspicious activity" in a McDonald's parking lot. *Id.* at *2. The dispatcher said a man had been parked there for over half an hour, "jumping up and down inside his car," "waving a knife back and forth." *Id.* The dispatcher added it was unknown if he was alone in the car. *Id.*

The sun had not risen when officers Jacobs and Mott arrived around 6:22 am at the McDonald's. *Id.* at *3. It faced the frontage road and the four-lane highway; weekday traffic moved steadily, interrupted by stop signs on the frontage road and stoplights on the highway. *Id.*

Kong sat in the driver's seat, windows rolled up, rocking back and forth, slashing a large knife through the air in front of him. *Id.* The officers pointed their firearms and flashlights at him, repeatedly shouting "drop the knife" and "let me see your hands." *See id.* at *4. Officer Jacobs told Kong he was under arrest. *Id.* Kong did not comply or cease his "abnormal" motions. *Id.* at *3–4. Both officers later stated that, at the scene, they thought Kong was high on methamphetamines. *Id.* at *3.

Officer Lynrae Tonne arrived, parking in the space facing Kong's car to block him in from the front. *See id.* at *4. Kong continued to "occasionally burst into frantic fits of gyrations and knife waving." *Id.* Awaiting backup, the officers discussed what to do next. *Id.* Officer Jacobs called for a medic to be staged nearby. *Id.* He also asked if anyone was "laying down or hurt or injured in the back" of Kong's car. *See id.* The officers could not see through the fogged back windows. *See id.* at *5. Officer Jacobs said, "I'm just afraid he's got a gun in the car." *See id.* at *4.

McDonald's customers continued to drive through, immediately behind Kong's car. The officers' body cameras recorded 13 vehicles moving through the parking lot during the encounter with Kong. *Id.* at *3. Officer Jacobs moved his vehicle behind Kong's car to block him in (also slowing the drive-through traffic). *See id.* at *4. Officer Mott radioed that any additional units should completely block off traffic entering the parking lot. *Id.* at *5.

Sergeant Maksim Yakovlev arrived, parking his vehicle at the frontage entrance, lights flashing, but not completely blocking it. *Id.* Officer Jacobs told him Kong was "contained," but the officers should consider breaking a window and tasing him in case "he hops out of that car." *Id.* Sergeant Yakovlev suggested they "figure

out if he's by himself there first." *Id.* Officer Jacobs then broke Kong's back passenger window, instructing the others, "Look for any guns." *See id.*

Officer Jacobs next broke Kong's front passenger window. *Id.* at *6. The officers repeatedly yelled, "Drop the knife." *Id.* Kong did not respond. Officer Jacobs yelled, "Taser, taser," firing his taser at Kong. *Id.* Kong squealed—high pitched, distressed. *Id.* He did not drop his knife or stop bouncing up and down in his seat. *Id.* Kong then swung his knife closer to the broken passenger-side window where officer Jacobs stood. *Id.* Jacobs tased him again. *Id.* Kong fell back in his seat. *Id.*

Right after the second tasing, Kong stumbled out the driver-side door, falling to the pavement. *Id.* He quickly stood up, knife in hand, and began running across the parking lot toward the frontage road and highway, away from the officers and McDonald's. *Id.* Within seconds, officers Mott, Jacobs, and Yakovlev shot him from the back and side, firing at least 23 bullets. *Id.* Fifteen bullets hit Kong, killing him instantly around 6:29 am. *Id.*

As the officers fired their guns, a customer's vehicle exited the parking lot about 30 feet away. *Id.* at *7. Kong ran in the general direction of the vehicle, although not at it in particular. *Id.* Kong ran toward the frontage road and highway. *Id.* During the shooting, a few cars passed by along the frontage road, 100 feet away. *See id.* Steady traffic continued on the highway beyond. *Id.*

The Trustee sued the City of Burnsville and officers Yakovlev, Mott, and Jacobs. The Trustee asserts claims under (1) 42 U.S.C. § 1983 for excessive force and (2) Minnesota law for negligent failure to follow Burnsville police department policies. The district court denied the defendants' motion for summary judgment. They appeal.

-4-

II.

The officers assert qualified immunity against the Section 1983 claim. They are entitled to qualified immunity unless (1) the facts show a violation of a constitutional right, and (2) the right was clearly established at the time of the misconduct. *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009). This court reviews de novo the denial of qualified immunity. *Raines v. Counseling Assocs., Inc.*, 883 F.3d 1071, 1074 (8th Cir. 2018).

A.

The Trustee argues that this court lacks jurisdiction over the qualified immunity issue. A denial of summary judgment on qualified immunity is appealable "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). *See also Felder v. King*, 599 F.3d 846, 848 (8th Cir. 2010). Although this court cannot find facts, it may determine whether the undisputed facts support the district court's legal conclusions. *Brown*, 518 F.3d at 557; *Raines*, 883 F.3d at 1074. This court views disputed facts most favorably to the plaintiff, including all reasonable inferences. *Wallace v. City of Alexander*, 843 F.3d 763, 767-68 (8th Cir. 2016).

The Trustee contends that the qualified immunity issue requires this court to resolve disputed facts. Courts of appeals may review the legal issues whether conduct violated the Fourth Amendment or clearly established law. *Plumhoff v. Rickard*, 572 U.S. 765, 773 (2014). While this court cannot review whether a factual dispute is genuine, it may review the purely legal question whether a factual dispute is material. *Thompson v. Murray*, 800 F.3d 979, 983 (8th Cir. 2015). A nonmaterial difference in facts does not prevent appellate review. *See Malone v. Hinman*, 847 F.3d 949, 953-54 (8th Cir. 2017). Here, this court can decide the legal issues without

resolving disputed facts, using the facts the district court specifically found adequately supported, and those it likely assumed by viewing the record favorably to the plaintiff, unless blatantly contradicted by the record. *See Brown*, 518 F.3d at 557-58; *Scott*, 550 U.S. at 380. This court has jurisdiction to review the qualified immunity issue.

## B.

The Trustee argues that the defendants violated Kong's Fourth Amendment right to be free from unreasonable seizure when they shot him. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (holding "apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment"). "[T]he question whether an officer has used excessive force 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018), *quoting Graham v. Connor*, 490 U.S. 386, 396 (1989). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* "[T]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* Qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Id.*

"[W]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Id., quoting Garner*, 471 U.S. at 11. A fleeing suspect must thus pose "an immediate and

-6-

significant threat of serious injury or death to the officer or to bystanders." **Wallace**, 843 F.3d at 769.

Even if the facts showed that the officers had violated Kong's Fourth Amendment right, the law at the time of the shooting—March 17, 2016—did not clearly establish the right. For a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." **Kisela**, 138 S. Ct. at 1152; **Ashcroft v. al-Kidd**, 563 U.S. 731, 741 (2011). The law must provide "fair warning" to officials that conduct is unconstitutional. **Tolan**, 472 U.S. at 656. "Specificity is especially important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." **Kisela**, 138 S. Ct. at 1152 (alteration added), *quoting* **Mullenix v. Luna**, 136 S. Ct. 305, 308 (2015). "Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." **Id.** at 1153. "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." **Id.**, *quoting* **Plumhoff**, 572 U.S. at 778-79.

Two years after Kong's 2016 shooting, the Supreme Court held that its case law did not clearly establish that officers acted unreasonably by shooting a woman who stood calmly with a kitchen knife by her side six feet from a bystander. *See* **Kisela**, 138 S. Ct. at 1152. Although the Burnsville defendants could not rely on *Kisela* for guidance, the Court's analysis of its own pre-2016 precedent is instructive. Like Kong, the woman shot in *Kisela* was not suspected of any felony, and police responded to a report she was "acting erratically" with a knife. *See **id.*** at 1151, 1153. During the encounter, she did not raise the knife toward the police or others. *See **id.***

Like Kong, she did not acknowledge the officers' presence or obey their commands to drop the knife. *See id.* Holding that *Kisela* was "far from an obvious case in which any competent officer would have known that shooting" the woman would violate her rights, the Court relied only on cases decided before March 2016, when Kong was shot. *See id.* at 1152-53.

The Court also held that case law of the relevant circuit did not clearly establish the right. *See id.* at 1153-54 (analyzing the Ninth Circuit opinion below). Denying qualified immunity, the Ninth Circuit had relied on a case where a sniper positioned safely on a hilltop shot a man in the back as he retreated into a cabin. *Id.* at 1154, *analyzing **Harris v. Roderick**, 126 F.3d 1189, 1202-03 (9th Cir. 1997) (holding sniper violated clearly established law by shooting unarmed man who made no aggressive move at the time of the shooting). The Court held that "a reasonable police officer could miss the connection between the situation confronting the sniper" in *Harris* and the situation in *Kisela*. *Id.*

Similarly, this court's case law at the time of Kong's shooting did not place the question of his right beyond debate. The Trustee argues the officers should have known that shooting Kong was an unreasonable seizure under the *Ludwig* case. *See **Ludwig v. Anderson**, 54 F.3d 465, 473 (8th Cir. 1995) (denying qualified immunity to officers who fatally shot Ludwig as he fled with a knife). Ludwig may have been running away from bystanders when shot, with the nearest bystander 150 feet away. *Id.* at 473. This court also assumed Ludwig did not physically threaten a police officer. *Id.* at 473-74. Shot at a distance when posing no threat to officers or citizens, Ludwig was like the unarmed man shot in *Harris*, which the Supreme Court rejected as distinct from the woman in *Kisela* standing calmly with a knife near a bystander. *See **Kisela**, 138 S. Ct. at 1154.

In contrast to Ludwig, Kong ran toward bystanders, including a woman driving only 30 feet away. *Kong*, 2018 WL 6591229, at \*7. Other cars were parked in the McDonald's lot, with at least one pedestrian visible among them on the body-camera footage. The steady flow of vehicles through the parking lot meant that citizens might quickly approach or step out of their vehicles. And, a few cars passed by along on the frontage road, only 100 feet away, with steady traffic on the highway beyond. *See id.* While pointing their handguns at Kong's car, the officers continually warned each other about "crossfire" hitting an officer or citizen, in or out of a vehicle, by firing at the wrong angle. If the officers waited, a car might block their line of fire or bystanders get too close for them to fire. In fact, a bullet that missed Kong lodged in the bumper of a vehicle pulling out of the parking lot 30 feet away. *Id.* When Kong began running through the occupied parking lot, toward the frontage road and highway, the officers "were forced to make a split-second judgment in circumstances that were tense, uncertain, and rapidly evolving." *Id.* at \*18. Although Kong may not have threatened an officer with his knife, he posed a threat to citizens. This situation differs from *Ludwig*, where this court did not mention nearby traffic or "citizens who *might* be in the area" and endangered by crossfire. *See Mullenix*, 136 S. Ct. at 309-10 (emphasis in original); *Ludwig*, 54 F.3d at 473-74. A reasonable officer could miss the connection between the situation confronting officers in *Ludwig* in the woods and the situation with Kong in the McDonald's parking lot.

Cases decided by this court after *Ludwig* make clear that, at the time of Kong's shooting, officers could use deadly force to stop a person armed with a bladed weapon if they reasonably believed the person could kill or seriously injure others. *See Hayek v. City of St. Paul*, 488 F.3d 1049, 1055 (8th Cir. 2007) (samurai sword); *Hassan v. City of Minneapolis*, 489 F.3d 914, 919 (8th Cir. 2007) (machete); *Estate of Morgan v. Cook*, 686 F.3d 494, 498 (8th Cir. 2012) (knife). Though Kong appeared high on meth, the cases establish that mental illness or intoxication does not reduce the immediate and significant threat a suspect poses. *See, e.g., Hassan*, 489

F.3d at 919 (mental illness); *Estate of Morgan*, 686 F.3d at 498 (intoxication). True, the Burnsville officers' training and department policy advised that "taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis." However, acting contrary to training "does not itself negate qualified immunity . . . so long as a reasonable officer could have believed that his conduct was justified." *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015). *See generally Davis v. Scherer*, 468 U.S. 183, 194 (1984) ("Officials sued for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision."); *Cole v. Bone*, 993 F.2d 1328, 1334 (8th Cir. 1993) (same, for police department policy). At any rate, the Burnsville policy says, "Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in a crisis."

Even if the officers caused Kong to leave his car by confronting him, they would reasonably believe the law allowed them to shoot him if he posed an immediate and significant threat. Even if officers "created the need to use" deadly force by trying to disarm a mentally ill person, the reasonableness of force depends on the threat the person poses during the shooting. *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995). In *Schulz*, a mentally ill man isolated himself in his parents' basement. *Id.* at 645. Although he initially presented no threat and had committed no crime, officers removed his hatchet and tried to subdue him. *Id.* at 646. The suspect attacked with an ax, forcing an officer to shoot him. *Id.* This court upheld exclusion of evidence that the officers "created the need to use force." *Id.* at 649.

Likewise, in *Hayek*, officers acted reasonably although their acts led a mentally ill man to attack them with a samurai sword. *Hayek*, 488 F.3d at 1054-55 (upholding qualified immunity for fatal shooting). Though Hayek had committed no crime, officers decided to remove him from his home because his mentally unstable behavior showed he might harm his mother, when she returned to the home. *Id.* at 1055. When he resisted being handcuffed, they chased him back into the home with a police

dog. *Id.* at 1053. Hayek attacked an officer with a samurai sword, forcing the other officers to shoot him in response to his threatening and violent behavior. *Id.* at 1053, 1055.

In *Hassan*, officers tried to disarm a man walking down the middle of the street carrying a machete and a tire iron. *Hassan*, 489 F.3d at 917. He ignored repeated commands to drop his weapons. *Id.* Seeing pedestrians in the direction he was headed, an officer tased him twice. *Id.* Running into the parking lot of a strip mall, the man raised his machete toward an officer (although he obeyed commands to stop). *Id.* He moved toward officers despite being tased. *Id.* at 918. He continued to approach officers, making slashing motions with his machete and hitting a police car with it. *Id.* Officers shot him fatally. *Id.*

Based on *Schulz*, *Hayek*, and *Hassan*, a reasonable officer would have believed the law permitted shooting Kong. Like the officers in *Schulz* and *Hayek*, the Burnsville officers tried to disarm Kong to prevent him from causing harm, even if he initially posed no immediate threat to others. *See Schulz*, 44 F.3d at 646; *Hayek*, 488 F.3d at 1055. When Kong left his car, the threat he posed justified lethal force, even if officers caused him to leave his car. *See Hayek*, 488 F.3d at 1055. Like the man in *Hassan*, Kong's unpredictable behavior with his weapon made him dangerous even if he had not yet harmed anyone. *See Hassan*, 489 F.3d at 919. *Cf. Swearingen v. Judd*, 930 F.3d 983, 988 (8th Cir. 2019) (holding that the law as of 2014 did not clearly establish a right when knife-wielding suspect posed threat of serious injury or death, even though he had not committed a violent crime against a person). Just as in *Hassan*, repeated commands and tasing did not cause Kong to drop his knife. *See Hassan*, 489 F.3d at 919. The encounter occurred in a McDonald's parking lot with citizens in the vicinity, like the strip mall parking lot in *Hassan*. *See id.* While *Hassan* involved pedestrians, the McDonald's parking lot had at least one pedestrian and several citizens in cars. *See id.* at 917.

-11-

The Trustee emphasizes that Kong, like Ludwig, may not have committed a violent felony. *See **Ludwig***, 54 F.3d at 473-74; ***Kisela***, 138 S. Ct. at 1152*, quoting* ***Graham***, 490 U.S. at 396 (one factor for excessive force is "the severity of the crime at issue"). The district court found a material dispute of fact whether Kong committed a violent felony by shaking the knife in the car and moving the blade closer to officer Jacobs. ***Kong***, 2018 WL 6591229, at *12. Viewing the facts most favorably to the Trustee, Kong did not commit a violent felony. ***Id.***

However, 17 years after *Ludwig*, in *Estate of Morgan*, this court held that a knife-wielding man posed an immediate and significant threat even though he did not commit a violent felony. *See **Estate of Morgan***, 686 F.3d at 497. Officers responded to a domestic disturbance at Morgan's house. ***Id.*** at 495. Morgan appeared intoxicated. ***Id.*** He stumbled on the porch, falling into a recliner, trying to conceal a kitchen knife by his side. ***Id.*** at 495-96. An officer pointed a gun at him from six to twelve feet away, ordering him repeatedly to drop the knife. ***Id.*** at 496. Morgan stood up, holding the knife pointed downward at his side. ***Id.*** He then raised his right leg as if to take a step in the officer's direction. ***Id.*** The officer shot him fatally. ***Id.*** This court held the officer acted reasonably because he had probable cause to believe Morgan posed a threat of imminent, substantial bodily injury. ***Id.*** at 497.

Like Morgan, Kong did not attack an officer with his knife before being shot. *See **Kong***, 2018 WL 6591229, at *6 (assuming facts most favorably to Kong). Neither Morgan nor Kong threatened officers verbally. *See **Estate of Morgan***, 686 F.3d at 495-96; ***Kong***, 2018 WL 6591229, at *5–6. Both men appeared under the influence of a substance. *See **Estate of Morgan***, 686 F.3d at 495; ***Kong***, 2018 WL 6591229, at *3. Based on *Estate of Morgan*, a reasonable officer would have believed the law permitted shooting Kong even without a violent felony.

Existing precedent of the Supreme Court and this circuit did not provide fair warning to the Burnsville officers that shooting Kong under these circumstances was unreasonable. The district court erred in denying the officers qualified immunity.

III.

The Trustee claims the defendant officers were negligent under state law for not following Burnsville police department policies, and that the City of Burnsville, as their employer, is vicariously liable for the officers' negligence. "The basic elements of a negligence claim are: (1) existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury." *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007).

The officers assert the defense of official immunity, and the City of Burnsville asserts vicarious immunity. The parties agree that the defendant officers' conduct was discretionary. *See **Smith v. City of Brooklyn Park***, 757 F.3d 765, 775 (8th Cir. 2014) ("Under Minnesota law, the decision to use deadly force is a discretionary decision."); ***Maras v. City of Brainerd***, 502 N.W.2d 69, 77 (Minn. Ct. App. 1993) (same). For discretionary conduct, government officials are entitled to official immunity unless "guilty of a willful or malicious wrong." ***Vasallo ex rel. Brown v. Majeski***, 842 N.W.2d 456, 462 (Minn. 2014). *See also **Elwood v. Rice Cty.***, 423 N.W.2d 671, 677 (Minn. 1988). An official shows malice only by "intentionally committing an act that the official has reason to believe is legally prohibited." ***Kelly v. City of Minneapolis***, 598 N.W.2d 657, 663 (Minn. 1999). *See also **Wertish v. Krueger***, 433 F.3d 1062, 1067 (8th Cir. 2006) (applying Minnesota law). This determination "contemplates less of a subjective inquiry into malice . . . and more of an objective inquiry into the legal reasonableness of an official's actions." ***State by Beaulieu v. City of Mounds View***, 518 N.W.2d 567, 571 (Minn. 1994). *See also **Smith***, 757 F.3d at 775.

-13-

This court reviews de novo the denial of official and vicarious immunity on summary judgment. *Gordon v. Frank*, 454 F.3d 858, 864, 866 (8th Cir. 2006).

A.

The Trustee argues that this court lacks jurisdiction over the defendants' official immunity defense. An appellate court may review a summary judgment of official immunity based on facts the district court found adequately supported or likely assumed. *See Smith*, 757 F.3d at 775. *See also Vasallo*, 842 N.W.2d at 462, 465; *Elwood*, 423 N.W.2d at 679 (granting official immunity because there was no genuine issue of fact). Here, the record, including the district court's factual findings and the officers' body-camera recordings, allows this court to review the denial of summary judgment. *Cf. Fedke v. City of Chaska*, 685 N.W.2d 725, 728 (Minn. Ct. App. 2004) (relying on video evidence to grant official immunity). This court has jurisdiction over the official immunity issue.

B.

The Trustee argues that the officers committed a willful or malicious wrong by willfully disregarding the Burnsville police department's policy on crisis intervention for persons "who may be experiencing a mental health or emotional crisis."

The policy says, "Nothing in this policy shall be construed to limit an officer's authority to use reasonable force when interacting with a person in crisis." The officers acted reasonably when they tried to disarm Kong in his car to prevent him from harming himself or others. *See Reuter v. City of New Hope*, 449 N.W.2d 745, 748, 750 (Minn. Ct. App. 1990) (granting official immunity to officers who tried to forcibly remove woman from car and restrain her because her erratic behavior

convinced them she would harm herself or her children). A reasonable officer would have believed deadly force was necessary to stop Kong from endangering bystanders when he ran through the parking lot with a large knife. *See Hassan*, 489 F.3d at 920 (applying Minnesota law). Therefore, the officers did not violate the policy. *See id.* ("Because the facts establish the officers' use of deadly force was reasonable, a reasonable fact finder could not conclude the officers' conduct was willful or malicious.").

Even if the officers negligently disregarded the policy, malice requires a higher standard—intentional wrongdoing. *See Vasallo*, 842 N.W.2d at 465 ("Malice is not negligence. It is the intentional doing of a wrongful act . . . the willful violation of a known right."); *Kelly*, 598 N.W.2d at 663 (holding that reckless acts did not show requisite intent for malice). Here, the evidence shows that, even if the officers acted negligently, they did not intentionally disregard the policy—as shown by comparing their acts to the policy.

The policy states that officers responding to a call involving a person in a crisis should request available backup and specialized resources if necessary. They should secure the scene and clear the immediate area. If circumstances reasonably permit, officers should consider and employ alternatives to force. They should use de-escalation techniques, such as taking no action or passively monitoring the situation, as appropriate. They should turn off flashing lights or sirens if feasible without compromising safety. Also, they should attempt to determine if weapons are present. Officers should take into account the person's potential inability to understand commands or appreciate the consequences of actions. They also should employ tactics to preserve the safety of all participants.

Officer Jacobs requested specialized resources, calling for a medic to stage nearby. *See Kong*, 2018 WL 6591229, at *4. The officers tried to secure the scene by blocking Kong's car and parking a patrol at the parking lot's entrance (even if

-15-

unsuccessful in stopping customers from driving through). *See id.* at *4–5. They requested backup to secure the scene. *Id.* at *5. Initially they employed alternatives to force, giving verbal commands Kong ignored. *Id.* They passively monitored Kong when they first arrived. *See id.* at *3. The officers turned off their sirens, and most turned off their flashing lights (with one vehicle's lights flashing to (partly) block incoming traffic). *See id.* The officers attempted to determine if firearms were present by breaking the fogged-up rear window. They took into account Kong's seeming inability to understand commands by using the taser to disarm him. *See id.* at *4, *6. Kong could have harmed himself or others with the knife, and his behavior suggested he needed medical or psychiatric treatment. Trying to disarm him was a tactic to preserve the safety of all participants.

Far from intentionally disregarding the policy, the officers' acts show they tried to follow it. Once Kong started running through the parking lot with the knife, the officers reasonably believed lethal force was necessary. The policy allows officers to use reasonable force. Because they did not willfully disobey the policy, the officers are entitled to official immunity.

The City of Burnsville is thus entitled to vicarious official immunity. "Vicarious official immunity is usually applied where officials' performance would be hindered as a result of the officials second-guessing themselves when making decisions, in anticipation that their government employer would also sustain liability as a result of their actions." ***Schroeder v. St. Louis Cty.***, 708 N.W.2d 497, 508 (Minn. 2006). Failing to grant immunity to the City of Burnsville would create a disincentive for the City to have policies on officers' interactions with persons undergoing a mental health crisis. *See id.* (granting immunity to avoid creating a disincentive for county to create policies on road-grading). *See also **Anderson v. Anoka Hennepin Indep. Sch. Dist. 11.***, 678 N.W.2d 651, 664 (Minn. 2004) ("The court applies vicarious official immunity when failure to grant it would focus stifling attention on an official's performance to the serious detriment of that performance.");

*Hayek*, 488 F.3d at 1057 (granting vicarious official immunity to city for officers' discretionary acts violating policy on emotionally disturbed persons).

The district court erred in denying the defendants summary judgment for the Trustee's state-law negligence claim.

\* \* \* \* \* \* \*

The judgment of the district court is reversed, and the case remanded for further proceedings consistent with this opinion.

KELLY, Circuit Judge, dissenting.

In my view, the district court correctly denied defendants' motion for summary judgment after viewing the evidence in the light most favorable to the Trustee and deciding that a reasonable jury could find defendants violated Kong's clearly established right to be free from excessive force. I also believe the district court correctly denied defendants summary judgment on the Trustee's state-law claims. Accordingly, I respectfully dissent.

**I.**

Officers are not entitled to qualified immunity if "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (cleaned up). The Trustee claims the officers violated Kong's clearly established right to be free from excessive force when they shot him as he fled his parked car. In assessing this claim, we ask whether the officers' actions were "'objectively reasonable' in light of the facts and circumstances confronting them." Graham v. Connor, 490 U.S. 386, 397 (1989). Three factors guide this inquiry: "[1] the severity

of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officer or others, and [3] whether the suspect is actively fleeing or resisting arrest."[1]  Wallace v. City of Alexander, 843 F.3d 763, 768 (8th Cir. 2016) (cleaned up); see Graham, 490 U.S. at 395.  Critically, the use of "deadly force against a fleeing suspect who does not pose a significant and immediate threat of serious injury or death to an officer or others is not permitted."  Capps v. Olson, 780 F.3d 879, 886 (8th Cir. 2015).

The district court determined that defendants are not entitled to qualified immunity on the Trustee's excessive-force claim.  Viewing the facts in the light most favorable to the Trustee, the court decided that a reasonable officer would not believe Kong had committed a violent felony or posed a "significant and immediate threat of serious injury or death" at the time he was shot.  Applying the factors above, the court concluded that a jury could find the officers' use of deadly force was objectively unreasonable in violation of the Fourth Amendment.

I agree with this analysis.  Defendants contend that the record conclusively shows the officers reasonably believed Kong had committed multiple violent felonies before he exited his car, which supported their decision to use deadly force.  But when the officers arrived on the scene, Kong was not suspected of a serious crime.  Dispatch simply reported "suspicious activity" in the McDonald's parking lot.  Kong

_____

[1]As to the third factor, this court has distinguished between a suspect "fleeing arrest" and a suspect "engaging in a hostile and intense physical struggle."  Wallace, 843 F.3d at 769 (cleaned up).  The mere act of fleeing arrest does not permit deadly force "unless the suspect poses an immediate and significant threat of serious injury or death" to the officer or others.  Id. (cleaned up).  Defendants do not suggest Kong was engaged in a physical struggle when he was shot.  Rather, the undisputed facts show he was running away from the officers at the relevant time.  As a result, the key factor in this case is whether the officers reasonably believed Kong posed an immediate and significant threat of serious injury or death when they shot him.  See id.

was inside his parked car, rocking back and forth in the driver's seat and waving a knife in an unfocused manner. He did not respond to the officers and said nothing during the entire incident. Kong moved the knife in Officer Jacobs's direction after he was first hit with a taser. But viewing this situation in the light most favorable to the Trustee, a reasonable officer would see this as an involuntary response to the intense electric current, rather than as evidence of an intent to assault or terrorize, as defendants now claim. And when Kong ultimately exited his car after being tased twice, he ran *away* from the officers and bystanders near the restaurant. A witness inside the restaurant stated that Kong looked "scared" as he ran from his car.

Given the officers' familiarity with their department's crisis-intervention policy, a reasonable officer in their position would have recognized the totality of the circumstances showed Kong was likely experiencing a mental-health crisis rather than committing violent felonies. This is supported by their post-shooting interviews with the Minnesota Bureau of Criminal Apprehension, in which none of the four officers claimed Kong had assaulted Jacobs or committed any other violent felony before they decided to shoot. Viewing the record in the light most favorable to the Trustee, the "severity of the crime at issue" does not support the reasonableness of the officers' deadly force. See Graham, 490 U.S. at 395; Wallace, 843 F.3d at 768.

I also agree with the district court that a jury could find the officers were unreasonable in their belief that Kong posed "a significant and immediate threat of serious injury or death to an officer or others." See Capps, 780 F.3d at 886. To determine whether a fleeing suspect poses a significant and immediate threat, an officer should consider "both the person's present and prior conduct." Wallace, 843 F.3d at 768. Still viewing the evidence in the light most favorable to the Trustee, a reasonable officer would have recognized that Kong was in the midst of a mental-health crisis and did not pose an immediate threat of serious injury or death. Kong was non-confrontational during the entire encounter. Indeed, he was running away from the officers and other pedestrians when he was shot. And while Kong carried

-19-

a knife, a reasonable officer would have known he did not pose a significant and immediate threat to anyone else in the vicinity because those people were driving inside their cars. Kong was moving away from the officers and was unlikely to confront, much less harm, any other person.

In sum, viewing the record in the light most favorable to the Trustee—as we must on summary judgment—a reasonable officer would not have believed Kong posed a significant and immediate threat of serious physical harm to the officers or the public. Thus, the use of deadly force was objectively unreasonable under the circumstances and amounted to excessive force. See Wallace, 843 F.3d at 768; Capps, 780 F.3d at 885.

## II.

The court concludes that even if the officers used excessive force when they shot Kong, they are nevertheless entitled to qualified immunity because they did not violate a clearly established right. Ante at 7. I respectfully disagree.

Like the district court, I believe defendants violated Kong's clearly established right to be free from excessive force, as set out in Ludwig v. Anderson, 54 F.3d 465 (8th Cir. 1995). The officers in Ludwig responded to a call concerning an "emotionally disturbed person" camped behind a restaurant with civilians nearby. Id. at 467. Officers attempted to arrest Ludwig for engaging in threatening behavior, prompting him to pull a knife and flee. Id. at 468. The officers chased him to a nearby street and formed a semicircle around him while pointing their guns and ordering him to drop the knife. Id. Ludwig continued to "switch[] the knife from hand to hand . . . as if [he] might throw the knife." Id. He "did not lunge at any police officer," although one officer stated otherwise at his deposition. Id. at 469. Then, despite knowing that mace might further perturb an "emotionally disturbed

-20-

person," an officer maced Ludwig. Id. This caused him to immediately turn and run "towards [a street] where [the officers] could see pedestrians." Id. Soon after Ludwig began to run, the officers shot and killed him. Id. Although he was running away from the officers, and the nearest visible bystanders were "across the street approximately 150 feet" away, officers believed deadly force was needed to "stop Mr. Ludwig from possibly attempting to get across the street, which he would then be in contact with other citizens that were in . . . [an] apartment building [and] could do harm." Id.

On these facts, this court decided the officers were not entitled to qualified immunity because "material questions of fact remain as to whether Ludwig's actions at the time of the shooting, even if dangerous, threatening, or aggressive, 'posed a threat of serious physical harm.'" Id. at 473 (cleaned up) (quoting Tennessee v. Garner, 471 U.S. 1, 11–12 (1985)). We explained that a reasonable jury could decide the officers violated the Fourth Amendment by shooting Ludwig after they "suspected him initially of being homeless and emotionally disturbed, and, later, of misdemeanor criminal activity which arguably placed no one in immediate harm." Id. at 474.

The court today concludes that our decision in Ludwig did not fairly warn defendants that their actions violated the Constitution because, unlike Ludwig, "Kong ran toward bystanders, including a woman driving only 30 feet away." Ante at 9. But officers shot Ludwig as he ran towards a street where the officers "could see pedestrians." Ludwig, 54 F.3d at 469. While Ludwig might not have been running directly towards the pedestrians when he was shot, the officers feared he would "attempt[] to get across the street, which he would then be in contact with other citizens," who were between 50 and 150 feet away.[2] Id. at 469, 473 n.6.

_____

[2]The court cites several subsequent cases to bolster its conclusion that the right at issue here was not clearly established. Ante at 9 (citing Estate of Morgan v. Cook, 686 F.3d 494, 497–98 (8th Cir. 2012); Hassan v. City of Minneapolis, 489 F.3d 914, 919 (8th Cir. 2007); Hayek v. City of St. Paul, 488 F.3d 1049, 1054–55 (8th Cir.

Although "clearly established law should not be defined at a high level of generality[,] it is not necessary . . . that the very action in question has previously been held unlawful," so long as precedent evinces "a fair and clear warning of what the Constitution requires." Thompson v. City of Monticello, 894 F.3d 993, 999 (8th Cir. 2018) (cleaned up). In my view, Ludwig clearly established that it is objectively unreasonable to use deadly force against a fleeing person who is likely experiencing a mental-health crisis and holding a knife if that person has not committed a violent felony, is moving away from officers, and does not pose a significant and immediate risk of serious harm. Because a reasonable jury could decide the officers violated this clearly established right when they shot Kong, I would affirm the district court's denial of qualified immunity. See Thompson, 894 F.3d at 1000.[3]

I respectfully dissent.

_____

_____

2007)). However, Kong, unlike the decedents in Morgan, Hassan, and Hayek, did not pose a significant and immediate threat of serious injury when he was shot; therefore, those cases are not comparable.

[3]I would also affirm the denial of official immunity on the Trustee's state-law claim. Official immunity applies unless the officers committed "a willful or malicious wrong." See State by Beaulieu v. City of Mounds View, 518 N.W.2d 567, 569 (Minn. 1994) (quoting Elwood v. Rice Cty., 423 N.W.2d 671, 677 (Minn. 1988)). This depends on "the legal reasonableness of [the officers'] actions." Id. at 571. Viewing the record in the light most favorable to the Trustee, the officers were objectively unreasonable in their use of force, as explained above. Therefore, the district court correctly denied official immunity. See Maras v. City of Brainerd, 502 N.W.2d 69, 78 (Minn. Ct. App. 1993) (denying official immunity at summary judgment because the officer's "intentional" decision to shoot a person brandishing a knife, whom he deemed a threat, along with the officer's "aware[ness] of state and city policy regarding the use of deadly force," were "sufficient to let the jury decide whether his actions constituted a willful or malicious wrong").